# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-00648-COA

**MONTREAL BROWN**                                            **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                      **APPELLEE**

DATE OF JUDGMENT:                02/12/2022
TRIAL JUDGE:                     HON. DEBRA W. BLACKWELL
COURT FROM WHICH APPEALED:       ADAMS COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:         ALISON O'NEAL McMINN
                                 AUTUMN TAYLOR BREEDEN
ATTORNEY FOR APPELLEE:           OFFICE OF THE ATTORNEY GENERAL
                                 BY: ALEXANDRA LEBRON
DISTRICT ATTORNEY:               SHAMECA SHANTE' COLLINS
NATURE OF THE CASE:              CRIMINAL - FELONY
DISPOSITION:                     AFFIRMED IN PART; VACATED IN PART -
                                 09/17/2024
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., SMITH AND EMFINGER, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1.     Montreal Brown appeals his convictions in the Adams County Circuit Court of second-degree murder and aggravated assault. On appeal, Brown asserts the following assignments of error: (1) the trial court erred by increasing Brown's sentence by five years on each count pursuant to Mississippi Code Annotated section 97-37-37(1) (Rev. 2014) for the use of a firearm during the commission of a felony; (2) the State committed prosecutorial misconduct; (3) Brown's trial counsel was ineffective; (4) the trial court erred in admitting evidence of a bullet "shell casing" recovered from outside Brown's house; and (3) the convictions were against the sufficiency and weight of the evidence.

¶2.     After our review, we find that the firearm enhancement portion of Brown's second-degree murder conviction should be vacated; however, we affirm Brown's convictions and sentences in all other respects.

**FACTS**

¶3.     In the early morning hours on July 22, 2018, officers with the Natchez Police Department responded to a call regarding a shooting at The Holiday Apartments, also known as The Oaks.[1]  At the scene, police officers discovered Shakeria King and J'Landrick Davis suffering from gunshot wounds.  King ultimately died as a result of her injuries.  During the course of their investigation into the shooting, police officers developed the following suspects: Brown, Curtavious Knight, Nicholas McGrew, and Carianta Allen.

¶4.     Brown was eventually indicted for the first-degree murder of King, the aggravated assault of Davis, and the drive-by shooting of Davis.  Knight, McGrew, and Allen all pleaded guilty to various charges related to King's murder and Davis's assault.

¶5.     At Brown's trial, the jury heard testimony from Knight and McGrew, as well as Commander Scott Frye and Detective Joseph Belling of the Natchez Police Department; Felicia McIntire, section chief of the firearm and toolmark division of the Mississippi Forensics Laboratory; Jacob Burchfield, a forensic scientist at the Mississippi Forensics Laboratory; and James Lee, the Adams County Coroner.

¶6.     After the State concluded its case-in-chief, Brown moved for a directed verdict on all counts.  The trial court granted Brown's motion on the drive-by-shooting charge; however,

---

[1] For continuity and clarity, we will refer to the apartments as The Oaks throughout this opinion.

the trial court denied the motion as to the other counts.

¶7.     The jury ultimately found Brown guilty of second-degree murder for King's death and guilty of the aggravated assault on Davis.  The trial court sentenced Brown to serve forty years in the custody of the Mississippi Department of Corrections (MDOC) for second-degree murder and twenty years in the custody of the MDOC for aggravated assault.  The trial court also sentenced Brown to an additional five years of incarceration on each conviction for the firearm enhancement, resulting in a total of seventy years in the custody of the MDOC, with each sentence set to be served consecutively.

¶8.     Brown filed a motion for a new trial, which the trial court denied.  More than a year after his conviction and sentence, Brown filed a postconviction petition for an out-of-time appeal.  The trial court granted his petition and appointed appellate counsel.  Brown then filed the present appeal.

## DISCUSSION

### I.     Firearm Enhancement for Second-Degree Murder Conviction

¶9.     Brown's first argument on appeal is that the trial court erred by applying the firearm enhancement to his sentence for second-degree murder.[2]  Brown argues that the jury's verdict for the second-degree murder charge does not reflect a finding that Brown used a firearm during the offense, and therefore no factual basis existed for the trial court to apply the firearm enhancement to his second-degree murder charge.

---

[2] Although Brown is not challenging the trial court's application of the firearm enhancement to his aggravated assault sentence, we find that pursuant to *Davis*, the trial court did not err in applying the firearm enhancement to Brown's aggravated assault sentence.

¶10.    Brown acknowledges that his trial counsel did not object to the firearm enhancement before the trial court, and he therefore asks this Court to review the issue for plain error. The Mississippi Supreme Court has held that "the plain error doctrine applies to illegal sentencing because an accused has a fundamental right to be free of an illegal sentence." *Davis v. State*, 379 So. 3d 312, 317 (¶14) (Miss. 2024) (internal quotation mark omitted). "An illegal sentence is one that exceeds the maximum statutory penalty for the crime." *Id*. (internal quotation mark omitted).

¶11.    Here, the trial court sentenced Brown to forty years in the custody of the MDOC for his second-degree murder conviction. Brown was also sentenced under section 97-37-37(1), which added five years to each conviction (second-degree murder and aggravated assault). Section 97-37-37(1) provides:

> *Except to the extent that a greater minimum sentence is otherwise provided by any other provision of law*, any person who uses or displays a firearm during the commission of any felony shall, in addition to the punishment provided for such felony, be sentenced to an additional term of imprisonment in the custody of the Department of Corrections of five (5) years, which sentence shall not be reduced or suspended.

Miss. Code Ann. § 97-37-37(1) (emphasis added). Brown was ultimately sentenced to a total of forty-five years in the custody of the MDOC for his second-degree murder conviction with this enhancement.

¶12.    The State concedes that the trial court erred in applying the firearm enhancement to Brown's second-degree murder conviction, citing *Davis*, 379 So. 3d at 318 (¶18). In *Davis*, the appellants were convicted of two counts of first-degree murder and sentenced to serve life in prison. *Id.* at 316 (¶10). The trial court added a firearm enhancement to both

4

sentences under section 97-37-37(1), resulting in an additional five years for each count of first-degree murder. *Id*. at 316-17 (¶10).

¶13. On appeal, the supreme court determined that "a firearm enhancement under [s]ection 97-37-37(1) is prohibited [in this case] because 'a greater minimum sentence is otherwise provided by' [s]ection 97-3-21(1)." *Id*. at 318 (¶18). The court explained that the minimum (and maximum) sentence for first-degree murder is life imprisonment, and "[a] life sentence is greater than the five years provided for in [s]ection 97-37-37(1)." *Id*.; *see also Harris v. State*, 99 So. 3d 169, 172 (¶14) (Miss. 2012) (vacating firearm enhancement imposed under section 97-37-37(2) because the minimum sentence the defendant could have received was greater than the ten-year sentence provided in section 97-37-37(2)). The supreme court therefore vacated the firearm enhancement portion of both appellants' sentences. *Id*. at 318 (¶18).

¶14. In the case before us, Brown was convicted of second-degree murder, and the minimum sentence he could have received was twenty years—fifteen years greater than the five-year sentence provided for in the firearm enhancement statute. *See* Miss. Code Ann. § 97-3-21(1)(b) (Rev. 2014). Based on the supreme court's ruling in *Davis*, we find that the firearm enhancement portion of Brown's second-degree murder sentence should be vacated.[3]

## II.    Prosecutorial Misconduct

¶15. Brown next argues that the State committed prosecutorial misconduct in its closing

---

[3] Because we are vacating the firearm enhancement portion of Brown's second-degree murder sentence on other grounds, we decline to address Brown's argument as to whether a factual basis existed for the firearm enhancement. *See Davis*, 379 So. 3d at 317-18 (¶¶16-18).

arguments. Brown acknowledges that he failed to object during the State's closing arguments and that his arguments are procedurally barred on appeal. *Evans v. State*, 226 So. 3d 1, 31 (¶78) (Miss. 2017). However, Brown asks this Court to review the issue for plain error. "[T]he plain error doctrine will be applied to closing arguments when the substance of the statement is out of bounds for closing arguments." *Spiers v. State*, 361 So. 3d 643, 662 (¶70) (Miss. 2023) (internal quotation marks omitted); *see also Ambrose v. State*, 254 So. 3d 77, 129 (¶161) (Miss. 2018). We will find that a prosecutor's statement was out of bounds if the statement "was so inflammatory that the trial judge should have objected on his own motion." *Spiers*, 361 So. 3d at 662 (¶70) (internal quotation marks omitted). Additionally, we must consider "[a]ny allegedly improper prosecutorial comment . . . in context, considering the circumstances of the case, when deciding on their propriety." *Ronk v. State*, 172 So. 3d 1112, 1137 (¶60) (Miss. 2015).

¶16. In reviewing Brown's claims of prosecutorial misconduct, we must also keep in mind that "[a]ttorneys are to be given wide latitude in making their closing arguments." *Spiers*, 361 So. 3d at 662 (¶71). Even so, prosecutors are prohibited from using "tactics which are inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury." *Id*. The trial court should intervene when a prosecutor "departs entirely from the evidence in his arguments or makes statements intended solely to excite the passions or prejudices of the jury, or makes inflammatory and damaging statements of fact not found in the evidence[.]" *Id*. at 662-63 (¶71). Reversible error occurs when "the natural and probable effect of the improper argument of the prosecuting attorney is to create such an unjust prejudice against

6

the accused as to result in a decision influenced by the prejudice so created." *Murry v. State*, 359 So. 3d 1104, 1113 (¶27) (Miss. Ct. App. 2022).

¶17.    During the State's rebuttal closing argument, the prosecutor made the following statement:

> And if you recall from the opening statement made by Counsel Opposite, he told you were gonna hear all of this from [Brown]. But remember the instruction says, you can't hold that against him that he didn't testify.  But somebody has to tell you the truth.  I would hope that the lawyer would.  But even he says I'm just making all this up.  This is what I think happened.  It's not supported evidence.

Brown asserts that the State improperly commented on his decision not to testify and insinuated that Brown did not testify because he is guilty.  "The Fifth Amendment, in its direct application to the Federal Government and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Evans*, 226 So. 3d at 32 (¶81) (quoting *Griffin v. California*, 380 U.S. 609, 615 (1965)).  Our supreme court has specifically held that "any reference to the defendant's failure to testify implying that such failure is improper, or that it indicates the defendant's guilt" is prohibited. *Wright v. State*, 958 So. 2d 158, 161 (¶8) (Miss. 2007).

¶18.    As stated, we must consider any allegedly improper comment in context. *Ronk*, 172 So. 3d at 1137 (¶60).  Our review of the trial transcript shows that during opening statements, defense counsel informed the jury that they would hear testimony from both McGrew and Brown regarding their versions of the events leading up to the shooting:

> [Brown is] gonna be up here and he plans to testify.  I have advised him of his

7

rights, but he plans to testify and . . . . He'll say, I was wrong. I did not call the police. We just went back and then I lied when the police came to see me.

. . . .

The whole thing is it's gonna be a question of who do you believe. Do you believe Mr. Knight? Or do you believe Mr. Brown and/or Mr. McGrew [who is] gonna be testifying? It's up to y'all to weigh it. Figure it out. Look at them. Find out from their demeanor. Figure out . . . what's logically the best.

¶19. After considering the State's comments during his rebuttal of closing arguments in context, we find that the State was simply referencing defense counsel's opening statement that the jury would hear the same version of events from Brown and McGrew, and the jury would have to decide if they believed Brown and McGrew's version or if they believed Knight's version. Because we have held that "in closing argument the State may comment upon the defense's opening statement[,]" we find that the State's comments were not improper. *Slaughter v. State*, 752 So. 2d 1092, 1095 (¶10) (Miss. Ct. App. 1999).

¶20. Additionally, we find that the State was not implying that Brown's failure to testify indicated Brown's guilt. Rather, by telling the jury that "somebody has to tell you the truth[,]" the State was responding to the assertions defense counsel made in his closing argument and commenting on the weakness of the defense's case. During rebuttal, the State asked the jury, "Why is [defense counsel] telling you things that did not come from that witness stand? If his client is so innocent, why does he have to make up stuff?" The State then referenced testimony from McGrew as well as statements made by defense counsel in his closing argument that the State alleged were not supported by the evidence. Our caselaw is clear that "[t]he [S]tate is entitled to comment on the lack of any defense, and such

8

comment will not be construed as a reference to a defendant's failure to testify by innuendo and insinuation." *Shook v. State*, 552 So. 2d 841, 851 (Miss. 1989) (internal quotation marks omitted). In fact, "it is proper to comment on the lack of a successful defense." *Evans*, 226 So. 3d at 32 (¶81).

¶21. Finally, the trial court gave the jury an instruction that cured any potential prejudicial effect the State's comment may have had on the jury. *See Birkhead v. State*, 57 So. 3d 1223, 1238 (¶53) (Miss. 2011); *Strahan v. State*, 729 So. 2d 800, 807 (¶29) (Miss. 1998); *Hall v. State*, 785 So. 2d 302, 305 (¶10) (Miss. Ct. App. 2001). Specifically, the trial court granted jury instruction D-5, Brown's proposed instruction regarding his right to testify, which stated:

> The Court instructs the Jury that [the] Defendant in a criminal prosecution has the privilege of taking the stand if he desires to do so. Such is his privilege, but it is not an obligation which is imposed upon him. He may or may not take the stand. It makes no difference in the case if he decides not to take the stand for whatever reasons he may have for not taking the stand, because the law gives the Defendant the right to choose whether or not he will take the stand to testify in his own behalf. If the Defendant does not take the stand, you must not consider that fact against the Defendant in deciding this case, because it is no evidence against him, nor does it raise any presumption whatsoever against the Defendant. You must decide this case entirely aside from that fact, and you must not let the question of whether or not the Defendant took the witness stand influence your decision in any way, because the Defendant does not have to testify unless he wants to.

"[We] presume[] that jurors have followed the instructions of the court, because to presume otherwise would render the judicial system inoperable." *Evans*, 226 So. 3d at 26 (¶60).

¶22. After reviewing the prosecutor's comments in context and considering the circumstances of the case before us, we find that the comments did not rise to the level of plain error. *See Ambrose*, 254 So. 3d at 130 (¶165).

9

### III. Ineffective Assistance of Counsel

¶23. Brown argues that his trial attorney provided ineffective assistance of counsel failing to object to improper and damaging testimony. "[T]o prevail on a claim of ineffective assistance of counsel, a defendant must prove that his attorney's performance was deficient, and that the deficiency was so substantial as to deprive the defendant of a fair trial." *Morrow v. State*, 275 So. 3d 77, 83 (¶24) (Miss. 2019) (quoting *Holly v. State*, 716 So. 2d 979, 989 (¶37) (Miss. 1998)) (applying the two-pronged test for ineffective-assistance-of-counsel claims announced in *Strickland v. Washington*, 466 U.S. 668, 687-96 (1984)).

¶24. Here, Brown asserts that his trial counsel failed to object in the following circumstances: (1) when Commander Frye testified multiple times that Knight, the State's witness, was telling the "truth" and that McGrew, the defense witness, was lying; (2) when the State "badgered" McGrew during cross-examination; and (3) when the State commented on the fact that Brown did not testify at trial. Brown asserts that his conviction hinged on the credibility the jury assigned to the competing witnesses, Knight and McGrew; therefore, his trial counsel's failure to object to the inadmissible testimony from Commander Frye and to the State's improper badgering of McGrew gave greater credibility to Knight's testimony. Brown submits that his trial counsel's failure to properly object to this testimony, combined with the failure to object to the State's comments regarding Brown not testifying, clearly shows that his counsel's deficient performance substantially prejudiced Brown's defense.

¶25. "Ineffective-assistance-of-counsel claims generally are reserved for post-conviction relief [(PCR)]." *Ford v. State*, 333 So. 3d 896, 912-13 (¶41) (Miss. Ct. App. 2022) (citing

10

*Ross v. State*, 288 So. 3d 317, 324 (¶29) (Miss. 2020)). However, we will address ineffective-assistance-of-counsel claims on direct appeal when "[1] the record affirmatively shows ineffectiveness of constitutional dimensions, or [2] the parties stipulate that the record is adequate and the Court determines that the finding of facts by a trial judge able to consider the demeanor of the witnesses, etc., are not needed." *Id*. We will also review ineffective-assistance-of-counsel claims on direct appeal "when the record affirmatively shows the claims are without merit." *Id*. at 912-13.

¶26. Brown argues that his ineffective-assistance-of-counsel claims are based on his trial counsel's failure to object in three different contexts, and he contends the trial transcript is the only record that is necessary to review Brown's claims. As a result, Brown submits that this Court's review of his ineffective-assistance-of-counsel claims are appropriate on direct appeal. However, the State did not stipulate that the record is adequate to allow this Court to make a finding on the merits. Instead, the State argues that Brown's claim is not ripe for appeal, and therefore this Court should "dismiss this issue without prejudice to Brown's right to raise the claim in a properly filed motion for post[]conviction relief." *See Murray v. State*, 345 So. 3d 610, 624 (¶39) (Miss. Ct. App. 2022).

¶27. Upon review, we find that the record does not affirmatively show ineffectiveness of constitutional dimensions. Furthermore, "the issue of whether [Brown's] counsel was ineffective by failing to make certain objections is not fully apparent from the record." *Brady v. State*, 337 So. 3d 218, 229 (¶38) (Miss. 2022). The supreme court has held that "[c]omplaints concerning counsel's failure to file certain motions, call certain witnesses, ask

11

certain questions, and make certain objections fall within the ambit of trial strategy." *Id.* at

(¶39). Such claims "require a consideration of facts beyond the contents and face of the

record." *Id*. We therefore find that Brown's claim would be better developed through a PCR

motion. Accordingly, we deny Brown's ineffective-assistance-of-counsel claim without

prejudice to his right to raise the issue in a PCR motion. *Id*.

### IV.    Admission of Evidence

¶28. Brown next argues that the trial court abused its discretion when it admitted the

9-millimeter shell casing recovered from his brother's murder scene into evidence. Brown

maintains that the shell casing was not relevant and that it was prejudicial to his case.

¶29. We review a trial court's decision to admit or exclude evidence for an abuse of

discretion. *Roberson v. State*, 199 So. 3d 660, 668 (¶32) (Miss. 2016). Mississippi Rule of

Evidence 402 provides that "[r]elevant evidence is admissible unless" the Constitution of the

United States, the Constitution of the State of Mississippi, or the Mississippi Rules of

Evidence provide otherwise. Evidence is considered relevant if "it has any tendency to make

a fact more or less probable than it would be without the evidence" and if "the fact is of

consequence in determining the case." MRE 401. However, relevant evidence may be

excluded "if its probative value is substantially outweighed by a danger of one or more of the

following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting

time, or needlessly presenting cumulative evidence." MRE 403. This Court has clarified that

the exclusion of relevant evidence under Rule 403 is "permissive, not mandatory." *Wallace*

*v. State*, 369 So. 3d 83, 89 (¶19) (Miss. Ct. App. 2023). The decision of whether to exclude

relevant evidence under Rule 403 "is committed to the broad discretion of the trial judge, and our standard of review is highly deferential." *Id*.

¶30.   At trial, Commander Frye testified that Brown's brother Martez was shot and killed two weeks before the July 18, 2022, drive-by shooting at The Oaks.  At the time of his murder, Martez was sitting outside in front of the home that he shared with Brown.  Commander Frye testified that during the investigation into Martez's murder, police officers recovered a 9-millimeter shell casing and a .45-millimeter shell casing in the front yard of Martez and Brown's home.  During Commander Frye's testimony, the State moved to admit into evidence the 9-millimeter shell casing recovered from Martez and Brown's home.  Defense counsel objected to the relevancy of the shell casing, arguing that it was relevant to Martez's murder and not the drive-by shooting at issue.  The State responded that it was introducing the shell casing for the purpose of showing motive.  The trial court overruled defense counsel's objection and admitted the shell casing into evidence.

¶31.   On appeal, Brown argues that Martez's murder was unrelated to the drive-by shooting at The Oaks; as a result, the shell casing was not relevant and was more prejudicial to Brown than probative.  Brown argues that the State failed to present any evidence showing that Brown owned a 9-millimeter gun.  Commander Frye testified that although the 9-millimeter shell casing was recovered from Martez and Brown's front yard, there was no indication of who fired it or when it was fired.  Detective Belling also testified that police officers did not recover a 9-millimeter gun when they searched Brown's home.  Brown further asserts that

13

the testimony at trial shows he was not outside the house at the time Martez was shot.[4]

Brown disputes the State's assertion that it introduced the shell casing to show motive, and he argues that the State intended to mislead the jury and bolster Knight's credibility as a witness.

¶32. The State argues, however, that the shell casing was relevant and admissible because it made the State's theory that the shooting at The Oaks was in retaliation for Martez's murder more probable. The State also maintains that the probative value was not outweighed by any prejudice because the State did not introduce the shell casing to imply that Brown was involved in Martez's murder but, rather, to show a connection and motive to the drive-by shooting.

¶33. In *Ronk*, 172 So. 3d at 1124 (¶14), the defendant, Ronk, was charged with capital murder and armed robbery. On the day of his arrest, police officers found a knife in Ronk's vehicle. *Id*. at 1133 (¶45). Police officers sent the knife to the crime lab to be tested for DNA or other genetic material, but the results were negative. *Id*. at (¶47). At trial, Ronk's girlfriend testified that Ronk admitted to stabbing the murder victim with a knife, and the forensic pathologist opined that the victim's multiple stab wounds were likely the cause of her death. *Id*. at (¶¶45-46). The State moved to introduce the knife into evidence for identification purposes only. *Id*. at (¶45).

---

[4] Commander Frye testified that Brown was not outside the house when Martez was shot; rather, he came outside after Martez had been shot. Commander Frye explained that a camera located on a building near Brown's house contained footage of Martez's shooting, but the footage was "very grainy and very distorted." Commander Frye testified that the footage showed that no one returned fire after Martez was shot, explaining "Martez's [shooting] was not a drive-by."

¶34. During the forensic pathologist's testimony, the State presented the knife to him, and the forensic pathologist opined that the knife was consistent with the type of knife used to inflict the wounds suffered by the victim. *Id*. at (¶46). On cross-examination, Ronk pointed out that the knife at issue had features that did not fully match the forensic pathologist's description of the knife used to inflict the victim's wounds. *Id*. However, the forensic pathologist maintained his opinion that the knife presented to him at trial was consistent with the type of knife used to stab the victim. *Id*.

¶35. During testimony from an investigator, the State finally moved to enter the knife into evidence. *Id*. at (¶47). Ronk objected, arguing that the knife was irrelevant to the crime because it did not match the forensic pathologist's description of the murder weapon. *Id*. The trial court denied Ronk's objection and admitted the knife into evidence. *Id*.

¶36. Ronk appealed, arguing that the trial court abused its discretion in admitting the knife into evidence. *Id*. Ronk claimed that the knife lacked relevance and also prejudiced his defense. *Id*. Upon review, the supreme court held that the trial court did not abuse its discretion in admitting the knife into evidence. *Id*. at 1134 (¶49). The supreme court acknowledged that no forensic evidence linked the knife to the victim's murder, but the court explained that "when there is evidence that a weapon could have caused an injury and some connection between the defendant and the weapon exists, the weapon will be deemed relevant and admissible." *Id*. (quoting *Ross v. State*, 954 So. 2d 968, 993 (¶46) (Miss. 2007)). The supreme court found that the testimony at trial supported the knife's admissibility. *Id*.

15

¶37. In the case before us, we find that the testimony from the witnesses, as well as the shell casings recovered from The Oaks, demonstrated a connection between Brown and the 9-millimeter shell casing. McIntire, who works for the Mississippi Forensic Laboratory, testified that after examining the shell casing recovered from Martez and Brown's home and the shell casings recovered from The Oaks, she determined that the shell casings were fired through the same gun. *See Ross*, 954 So. 2d at 993 (¶46). Detective Belling testified that Brown was the only one of the suspects who was present in both of the locations where the shell casings were found. *See id.* Commander Frye testified that although no one had been charged in connection to Martez's murder, Jack Lawrence Jackson was one of the names mentioned "on the streets" as being involved. Commander Frye confirmed that Jackson was present at The Oaks during the drive-by shooting. We therefore find that the 9-millimeter shell casing was relevant to show motive. Additionally, because the State introduced the shell casing to show motive and a connection between Martez's murder and the drive-by shooting—and not to imply that Brown was involved in Martez's murder—we find that the probative value was not substantially outweighed by the danger of any unfair prejudice.

¶38. Based on these facts, we find that the trial court did not abuse its discretion in admitting the shell casing into evidence.

### V. Sufficiency of the Evidence

¶39. Brown argues that the evidence at trial was insufficient to prove that he was guilty on all counts. "The sufficiency of the evidence is challenged with a motion for a directed verdict, a request for a peremptory instruction, or a motion for judgment notwithstanding the

16

verdict (JNOV)." *Pace v. State*, 242 So. 3d 107, 117 (¶24) (Miss. 2018).

¶40. After the State rested its case, Brown moved for a directed verdict, challenging the sufficiency of the evidence. The trial court granted Brown's motion as to the drive-by shooting charge, but the trial court denied the motion as to Brown's murder and aggravated assault charges. Brown then proceeded to present his case, with McGrew testifying for the defense.

¶41. Because Brown's motion for directed verdict was denied, and he then proceeded to introduce evidence on his own behalf, Brown was required to "renew his motion for directed verdict at the close of all evidence" to preserve his challenge to the sufficiency of the evidence on appeal. *Woods v. State*, 242 So. 3d 47, 54 (¶26) (Miss. 2018). The transcript reflects that Brown failed to renew his motion for a directed verdict at the close of evidence. Brown also failed to request a peremptory instruction or file a post-trial motion for JNOV.

¶42. Our supreme court has held that "[i]n the absence of a renewal of the directed verdict, a request for a peremptory instruction, or a motion for a judgment notwithstanding the verdict, [a defendant] has waived the sufficiency error on appeal." *Holland v. State*, 656 So. 2d 1192, 1197 (Miss. 1995). We therefore find that "[Brown] did not preserve his challenge to the sufficiency of the evidence for appeal because he did not renew his motion for a directed verdict at the close of evidence, request a peremptory instruction, or file a motion for JNOV." *Pace*, 242 So. 3d at 117 (¶25). Therefore, Brown has waived his challenge to the sufficiency of the evidence on appeal.

¶43. Notwithstanding Brown's waiver, we find that the State presented sufficient evidence

17

to support Brown's convictions. "In reviewing the sufficiency of the evidence on appeal, we view the evidence in the light most favorable to the State and decide if rational jurors could have found the State proved each element of the crime." *Boyd v. State*, 383 So. 3d 1280, 1286 (¶31) (Miss. Ct. App. 2024). In so doing, we "must accept as true all credible evidence consistent with guilt and give the State the benefit of all favorable inferences that may reasonably be drawn from the evidence." *Id*.

¶44. Brown was convicted of the second-degree murder of King and the aggravated assault of Davis. Second-degree murder is defined as the "killing of a human being without the authority of law" by "an act eminently dangerous to others and evincing a depraved heart, regardless of human life, although without any premeditated design to effect the death of any particular individual." Miss. Code Ann. § 97-3-19(1)(b) (Supp. 2017). Aggravated assault requires the jury to find that a defendant "attempt[ed] to cause or purposely or knowingly cause[d] bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm[.]" Miss. Code Ann. § 97-3-7(2)(a)(ii) (Supp. 2016). As we will discuss below, we find that a rational juror in this case could find the State proved that Brown committed the elements of second-degree murder and aggravated assault beyond a reasonable doubt.

¶45. Brown's main argument is that the entirety of the State's case against him is based on circumstantial evidence. "A circumstantial-evidence case is one where the State is 'without a confession and wholly without eyewitnesses to the gravamen of the offense charged.'" *Chism v. State*, 253 So. 3d 343, 349 (¶29) (Miss. Ct. App. 2018) (quoting *Garrett v. State*,

18

921 So. 2d 288, 291 (¶17) (Miss. 2006)). Direct evidence, on the other hand, "includes a confession, the testimony of an eyewitness to the gravamen of the offense, or surveillance video of the gravamen of the offense." *Morris v. State*, 303 So. 3d 9, 18 (¶28) (Miss. Ct. App. 2020). In the case before us, Knight and McGrew were eyewitnesses to the shooting, and both Knight and McGrew testified at trial. Accordingly, the State's case against Brown was not based solely on circumstantial evidence. *See Mangum v. State*, 762 So. 2d 337, 344 (¶21) (Miss. 2000) (finding that where accomplices to the crime provided eyewitness testimony, the case against the defendant was not based solely on circumstantial evidence); *accord Nevels v. State*, 325 So. 3d 627, 634 (¶20) (Miss. 2021) ("[T]he law makes no distinction between direct and circumstantial evidence . . . .").

¶46. Turning to examine the evidence presented at trial, the transcript reflects that Brown's brother Martez was shot and killed approximately two weeks before the drive-by shooting at The Oaks. As discussed, police officers discovered a 9-millimeter shell casing and .45-millimeter shell casings in Martez and Brown's front yard.

¶47. Martez's funeral was held on July 21, 2018. At approximately 1:00 a.m. on July 22, 2018, Natchez police officers responded to a call regarding a drive-by shooting at The Oaks. Police officers discovered that King and Davis were suffering from gunshot wounds. King ultimately died as a result of her injuries.

¶48. While on the scene after the shooting on July 22, 2018, officers interviewed witnesses and developed the following suspects as involved in the shooting: McGrew, Knight, Allen, and Brown. The officers immediately began locating the suspects and interviewing them.

19

¶49. Officers located Knight first and interviewed him within a few hours of the shooting. Commander Frye testified that Knight initially claimed that he was not present during the shooting. However, Commander Frye explained that police officers had already interviewed some of Knight's family members, and Knight's initial statements to the police conflicted with the statements from his family. Officers interviewed Knight a second time, and he again denied any involvement in the shooting. Officers then allowed Knight's grandmother into the interview room to speak with Knight. After talking with his grandmother, Knight asked police officers how he would be protected if he came forward with the truth about what occurred during the shooting.

¶50. During Knight's third interview, Knight told the officers that he, Allen, McGrew, and Brown were involved in the shooting and that the purpose of the shooting was to retaliate for Martez's murder. According to Knight, McGrew was driving the car,[5] and Knight was in the front passenger seat. Allen and Brown were in the backseat of the car, with Allen sitting behind the driver and Brown in the rear passenger side seat. Knight told officers that Allen and Brown both had 9-millimeter guns. Commander Frye testified that Knight's final statement to the police officers, including the suspects involved and the type of guns used, was consistent with the evidentiary findings from the police investigation.

¶51. Commander Frye testified that at the scene of the drive-by shooting, officers observed numerous shell casings on the ground. Detective Belling testified that police officers also recovered two shell casings from inside the car used during the shooting, and the location of

---

[5] The record shows that the vehicle belonged to Chris Combs, who was not present during the shooting.

20

the shell casings was consistent with Knight's statement that Allen and Brown were sitting in the backseat of the car when they fired their weapons.

¶52. The officers sent the shell casings to the Mississippi Forensics Laboratory for testing, and the results showed that all of the shell casings recovered from The Oaks were 9-millimeter shell casings. Officers also determined that the shell casings were fired from two different guns.

¶53. Felicia McIntire from the Mississippi Forensics Laboratory testified that the 9-millimeter shell casing recovered from Martez and Brown's yard after Martez's murder was fired from the same firearm as some of the 9-millimeter shell casings recovered from the drive-by shooting at The Oaks. Commander Frye also confirmed that "the firearm that was used to shoot that single round at the Brown's residence was also the same firearm that was used in the King murder." Detective Belling testified that Brown was the only one of the suspects who had been present at the location of Martez's shooting and the drive-by shooting at The Oaks.

¶54. As for the motive for the shooting, Commander Frye testified that the investigation revealed that the suspects intended to retaliate for Martez's murder. Commander Frye explained that during the investigation into Martez's murder, Jack Lawrence Jackson's name had come up "in the streets" as a possible suspect, but officers did not have any solid evidence tying Jackson to the murder. Commander Frye confirmed that Jackson was present at The Oaks during the drive-by shooting on July 22, 2018, but the gunshots missed him.

¶55. Knight testified at trial regarding the events that occurred on the evening of July 21,

2018, and the early morning hours of July 22, 2018. Knight stated that on the evening of July 21, he and McGrew were at a party. After Knight and McGrew left the party, they drove to pick up Allen and Brown, who are cousins. When Allen and Brown entered the car, they revealed to Knight and McGrew that they were each carrying a 9-millimeter gun. Knight testified that he was in the front passenger seat, and McGrew was driving the car. Allen and Brown were in the back seat, with Allen sitting behind McGrew and Brown sitting in the rear passenger side seat behind Knight.

¶56. After Brown and Allen entered the car, McGrew drove to The Oaks. According to Knight, McGrew announced, "We put Martez . . . in the grave today so we gotta put one of them in the grave," meaning that the purpose of driving to The Oaks was to retaliate for Martez's murder. Upon arriving at The Oaks, they saw a group of people standing around outside. McGrew pulled the car up until the passenger side was facing the group of people. Knight testified that Allen and Brown rolled down the car windows and began shooting into the group of people. Knight stated that Brown and Allen remained inside the car during the shooting—Brown, who was seated in the rear passenger seat, was shooting out of the car window, while Allen, who was in the back seat on the driver's side, stuck his upper body out of the car window and shot over the top of the car. Knight testified that the car was stopped during the shooting, and then McGrew drove off after the shooting stopped.

¶57. Knight testified regarding Brown's appearance and demeanor on the night of the shooting, describing his behavior as "normal." Knight stated that Brown did not appear sleepy and that he remained awake in the vehicle the entire time. Knight recalled hearing

22

Brown talking, as well as rapping to the music playing inside the vehicle.

¶58. Knight also admitted to lying to the police during his first and second interviews. Knight testified that he lied during the interviews because he was afraid of what Brown and Allen would do to him if he "snitched," explaining, "I had just seen those two individuals . . . discharge firearms into a crowd without any remorse and I [live] two houses [away] from them." Knight testified that due to the fear of retaliation, police officers housed him in different jails located outside Adams County.

¶59. Officers conducted a gunshot residue test on Knight. Commander Frye testified that the officers only tested Knight, and not the other suspects, because police officers picked up Knight within four hours of the drive-by shooting, and the other three suspects were interviewed much later. Results from the test showed the presence of gunshot residue on the back of Knight's right hand. Commander Frye testified that if someone had gunshot residue on their hands, "[i]t would indicate that he was in the presence of where a gun was fired anywhere in the vehicle."

¶60. Commander Frye testified that when the police interviewed Brown, he denied any involvement in the shooting. Brown told officers that on the day before the shooting, July 21, 2018, he attended his brother's funeral and then went home and took a nap. Brown claimed that he woke up at 5:00 p.m., and then his girlfriend came and picked him up at 10:00 p.m. However, Commander Frye said that Brown's girlfriend told the officers that she actually picked him up around 3:00 a.m. on July 22, roughly two hours after the shooting. Commander Frye recalled that during the interview, Brown denied taking Xanax on the

23

evening before the shooting or the morning of the shooting, but Brown admitted to the officers that he had smoked marijuana.

¶61.    Commander Frye testified that he also conducted two different interviews with Nicholas McGrew.  During both interviews, McGrew denied any involvement in the shooting.

¶62.    McGrew testified at trial that on the evening of July 21, 2018, he and Knight drove to pick up Brown and Allen.  McGrew described Brown as "on Xanax," explaining that "[y]ou c[ould] look at him and tell he was on drugs."  However, McGrew admitted that Brown never told him that he had taken any type of drugs or medication.  According to McGrew, Knight informed Brown that they were driving to The Oaks to fight.  Brown responded, "Okay," and then went back into the house to take a shower.  Brown then exited the house a few minutes later and got into the back seat of the car.  McGrew testified that he was driving the car, Knight was sitting in the front passenger seat, and Brown and Allen were in the backseat.  Unlike Knight's testimony, McGrew recalled that Brown was sitting behind the driver's seat and that Allen was in the rear passenger side seat.  According to McGrew, only Knight and Allen had guns.

¶63.    McGrew testified that on the way to The Oaks, Brown fell asleep in the back seat. McGrew pulled the car up next to a group of people who were standing outside.  McGrew testified that Knight and Jack Lawrence Jackson "exchanged words with each other," and Knight started shooting. McGrew testified that Allen opened the door of the vehicle and also began shooting.  McGrew stated that during the shooting, Brown woke up and asked what

24

was going on and why were they at The Oaks. McGrew explained to the jury that Brown was not supposed to be at The Oaks and that if certain people saw him there, "they might shoot at him or kill him."

¶64. McGrew admitted that in both of his interview with police officers, he denied any knowledge of the shooting. At trial, Knight and McGrew's police interviews were admitted into evidence and played for the jury.

¶65. The transcript reflects that Knight and McGrew provided conflicting accounts of the shooting, as well as conflicting accounts of whether Brown was under the influence of prescription medication. However, "Mississippi's caselaw is clear: when the evidence conflicts, the jury determines the facts in dispute." *Beasley v. State*, 362 So. 3d 112, 125 (¶45) (Miss. Ct. App. 2023). Indeed, "[t]he jury is the sole judge of the credibility of witnesses and the weight and worth of their testimony." *Id*. (quotation omitted).

¶66. Keeping in mind that the jury is the sole judge of the credibility of the witnesses and the weight and worth of their testimony, and viewing the evidence in the light most favorable to the State, we find that a rational juror could have reasonably found that the State proved that Brown was guilty of the second-degree murder of King and the aggravated assault of Davis. Both Knight and McGrew testified that Brown was present in the car during the shooting at The Oaks, and Commander Frye testified that upon arriving on the scene and interviewing witnesses, police officers developed Brown as a suspect. Knight also testified that Brown shot a 9-millimeter gun into a crowd of people at The Oaks. King was hit by gunfire and ultimately died as a result of her injuries, and Davis suffered gunshot wounds to

25

his leg. Testimony from Commander Frye and crime lab testing corroborated Knight's testimony that Brown used a 9-millimeter gun. Crime lab testing also revealed that 9-millimeter shell casings found in the front yard of Brown's house after Martez's murder were shot from the same gun used in the drive-by shooting that killed King and injured Davis. Detective Belling testified at trial that Brown was the only one of the suspects who had been present at the location of Martez's shooting and the drive-by shooting at The Oaks. Additionally, Knight testified that the purpose of driving to The Oaks was to retaliate for Martez's murder. Commander Frye corroborated this statement, testifying that the investigation revealed that the suspects drove to The Oaks to retaliate for Martez's murder. Commander Frye also stated that Jack Lawrence Jackson was a possible suspect in Martez's murder, and he confirmed that Jackson was present at The Oaks during the shooting on July 22, 2018.

¶67. Moreover, the jury was instructed that it could find Brown guilty if it found that he acted in concert with Knight, McGrew, and Allen. This Court has held that "[w]hen two people act in concert or when one person aids another in committing a crime, both are equally guilty as principals in the eyes of the law." *Gray v. State*, 328 So. 3d 194, 198 (¶11) (Miss. Ct. App. 2021). Therefore, "[Brown] did not have to pull the trigger to be found guilty." *Id*.

¶68. After our review, we find that the evidence was sufficient to prove each statutory element for second-degree murder and aggravated assault.

## VI. Weight of the Evidence

26

¶69. Brown also argues that the jury's verdicts were contrary to the overwhelming weight of the evidence.

¶70. The record reflects that the trial court denied Brown's post-trial motion for a new trial in which Brown challenged the weight of the evidence. When considering a challenge to the weight of the evidence, our role "is to review the trial court's decision to grant or deny a new trial for an abuse of discretion." *Little v. State*, 233 So. 3d 288, 292 (¶21) (Miss. 2017). In doing so, the Court "weigh[s] the evidence in the light most favorable to the verdict, only disturbing a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id.*

¶71. Brown asserts that for the same reasons he raised in his challenge to the sufficiency of the evidence, the jury's verdict is against the overwhelming weight of the evidence. This Court has recognized that "[e]ven when the evidence is sufficient to support a conviction, a defendant may be entitled to a new trial if the trial court determines that the guilty verdict returned by the jury was against the weight of the more credible evidence presented at trial." *Gray*, 328 So. 3d at 199 (¶17).

¶72. Based on the same evidence and testimony discussed above, we find that Brown's challenge to the weight of the evidence is without merit. After weighing the evidence in the light most favorable to the verdict, we find that allowing the verdict to stand in this case would not sanction an unconscionable injustice. We therefore find that the trial court did not abuse its discretion by denying Brown's motion for a new trial.

### VII. Cumulative Error

27

¶73. Finally, Brown argues that he is entitled to a new trial based on "cumulative error." Under the cumulative error doctrine, "reversible error" may be established when "the cumulative effect of all errors deprives the defendant of a fundamentally fair trial." *Ross*, 954 So. 2d at 1018 (¶138). However, "[w]here there is no error in part, there can be no reversible error to the whole." *Harris v. State*, 970 So. 2d 151, 157 (¶24) (Miss. 2007). The only error found by this Court relates to Brown's sentencing, which occurred after his trial. After our review of Brown's assignments of error relating to his trial, we find no errors in part; accordingly, we find no cumulative error.

## CONCLUSION

¶74. Based on the supreme court's ruling in *Davis*, the firearm enhancement portion of Brown's second-degree murder sentence is prohibited. Accordingly, we affirm Brown's convictions and sentences, except we vacate the five-year firearm enhancement added to Brown's sentence for his second-degree murder conviction.

¶75. **AFFIRMED IN PART; VACATED IN PART.**

**BARNES, C.J., WILSON, P.J., McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR. WESTBROOKS, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**