COLEMAN, JUSTICE, FOR THE COURT:
 

 ¶1. Richard Morrow was convicted of fondling and sentenced as a habitual offender to life in prison without parole. Morrow's trial counsel did not file a direct appeal. Nevertheless, the trial court allowed Morrow to proceed with an out of time appeal. Morrow raises four assignments of error: (1) whether the trial court erred in allowing testimony and comments about DNA evidence; (2) whether the victim's nonverbal responses were ambiguous and therefore insufficient to support the verdict; (3) whether he received ineffective assistance of counsel; and (4) whether cumulative error requires reversal. Discerning no reversible error, we affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶2. In July 2012, Morrow lived with his sister Carlie
 
 [1]
 
 in Corinth, Mississippi. Carlie's daughter Laura and her grandson Ben had lived with Carlie before Morrow moved in. Laura and Ben moved out and lived with various friends and Laura's aunt, who lived a few houses down the street from Carlie. Laura kept some of her clothes at Carlie's home. Laura and Ben visited often.
 

 ¶3. On July 26, 2012, when Ben was three years old, Laura and Ben went to Carlie's house so that Laura could gather some clothes, and Morrow was there. Carlie was not present when they arrived, but Laura and Ben waited for her to return because she had agreed to babysit Ben while Laura went to work.
 

 ¶4. While Ben was in the living room watching television, Laura was in her old room watching television and gathering clothes. Ben was wearing only his underwear. Laura exited her old room to get something to drink. She passed through the living room, and she noticed that Ben was not there. She went into the kitchen. When Laura walked into the kitchen, she saw Ben standing on the table facing Morrow. Laura saw Morrow pulling up Ben's underwear quickly, and she heard Ben's underwear pop against his waist. Laura pretended as if nothing was wrong, and Morrow began yelling at Ben to get off the table.
 

 ¶5. Ben told Laura that he needed to use the bathroom, so she took him into the bathroom. In the bathroom, Laura asked Ben what he was doing on the table, and he responded that he did not want to tell her because he was scared. Laura reassured
 Ben that he was not in trouble, and he told her that "Uncle Ricky
 
 [2]
 
 had sucked his peepee."
 
 [3]
 
 Laura then examined Ben's penis and saw that it was wet with saliva. Ben did not urinate while they were in the bathroom, and Laura was sure that the moisture was not urine.
 

 ¶6. Laura gathered their personal items; she dressed Ben, and they left to go to Laura's aunt's house. Laura called Carlie crying. Laura told Carlie something bad had happened and asked her to come get them. Carlie was near the house and picked up Laura and Ben. Carlie asked Ben what had happened, but he told her that he was scared and did not want to tell her. Carlie reassured him, and Ben told her the same thing that he had told Laura. Laura and Carlie went to Laura's aunt's house and called law enforcement to report the incident. They went to the Alcorn County Sheriff's Department where Laura provided a statement. Ben was taken to the hospital, and medical personnel swabbed his penis.
 

 ¶7. Ben, who was seven years old at the time of the trial, testified after Laura. Ben testified that Morrow put his mouth on his "middle spot," which he explained was what he uses to go to the bathroom. Ben's account of the incident corroborated Laura's testimony.
 

 ¶8. Reggie Anderson, a former criminal investigator with the Alcorn County Sheriff's Department, testified that he took Laura's statement regarding an alleged fondling. Anderson sent Ben to the hospital for a sexual assault examination kit to be performed. Anderson sent the sexual assault kit to the Mississippi Crime Laboratory. Anderson obtained permission from Morrow to take a DNA swab from him. Anderson provided a DNA sample from Morrow to the crime lab, but the crime lab misplaced the sample. Anderson obtained permission again from Morrow to take another DNA sample from him. Anderson submitted the second sample to the crime lab.
 

 ¶9. Anderson testified about the DNA results he had received from the crime lab:
 

 Q: What were the results?
 

 A: It came back as a male contributor on the penile swab of [Ben].
 

 Q: Was that a male contributor to the evidence found on the penis of [Ben]?
 

 A: Correct.
 

 ¶10. On cross-examination, Anderson testified that the report he received did not identify Morrow as the male contributor. On redirect, the prosecution again questioned Anderson about the crime lab results:
 

 Q: Did you state to the jury the results from the crime lab was a male contributor?
 

 A: Yes, sir.
 

 Q: Were there any other males accused in your investigation of the fondling of [Ben]?
 

 A: No, sir.
 

 Q: From the beginning of when this was reported to you on July 26 of 2012, was there one suspect?
 

 A: Yes, sir.
 

 Q: Was there one male accused?
 

 A: Yes, sir.
 

 Q: Under oath, tell the jury who that person is.
 

 A: Richard Morrow.
 

 ¶11. Anderson also testified about the statement Morrow had given. Morrow stated that he and Ben were in the kitchen
 playing with his false teeth, with Morrow removing them and putting them back in his mouth to entertain Ben. Ben asked to see the false teeth, took them, and put the false teeth in his underwear.
 

 ¶12. Morrow testified in his defense. Morrow's testimony tracked his statement, and he denied fondling Ben. Morrow testified that on the morning of July 26, 2012, Ben was in his underwear. Morrow testified that he had just eaten and was cleaning his dentures when Ben became curious. Morrow testified that he then put his teeth in and pulled them out several times to entertain Ben. Morrow testified that Ben then grabbed them and put them down his underwear. Morrow grabbed Ben's arm and took the dentures back. Morrow testified that he was washing his dentures and his hands while Ben climbed on the table to show Morrow his stomach. Morrow testified that he removed Ben from the table so he would not fall and continued drying his hands with a dish towel. Morrow testified that Laura walked in while he was drying his hands. Morrow testified that he freely gave DNA samples because he knew he did not touch Ben.
 

 ¶13. The jury found Morrow guilty of fondling. The trial court sentenced Morrow as a habitual offender to life in prison without the possibility of parole. Morrow's attorneys did not file any post trial motions and did not appeal his conviction. Morrow requested that the circuit court allow him to file an out of time appeal. The trial court granted Morrow's request, allowed his trial counsel to withdraw, and appointed the Office of Indigent Appeals as appellate counsel for Morrow.
 

 ¶14. Morrow appeals, arguing that 1) the hearsay testimony about the DNA results was improperly admitted and violated his Sixth Amendment right to confront witnesses against him, 2) Ben's nonverbal responses were ambiguous and thus insufficient to support the verdict, 3) his trial counsel rendered ineffective assistance of counsel, and 4) the cumulative effect of the errors raised requires reversal.
 

 STANDARD OF REVIEW
 

 ¶15. Morrow asks the Court to review the issues he raises on appeal for plain error because he did not raise the issues at trial. Under the plain error doctrine, the Court may recognize obvious error that was not raised at trial and that affects a fundamental, substantive right.
 
 Conners v. State
 
 ,
 
 92 So. 3d 676
 
 , 682 (¶ 15) (Miss. 2012). Moreover, the error must have "resulted in a manifest miscarriage of justice or 'seriously affect[ed] the fairness, integrity[,] or public reputation of judicial proceedings.' "
 

 Id.
 

 (quoting
 
 Brown v. State
 
 ,
 
 995 So. 2d 698
 
 , 703 (¶ 21) (Miss. 2008) ).
 

 DISCUSSION
 

 I. Whether the admission of testimony regarding the DNA results violated Morrow's constitutional rights to confront witnesses against him.
 

 ¶16. Morrow argues that the admission of testimony and comments on DNA results violated his constitutional rights to confront witnesses against him. We agree that allowing testimony relaying the results of the DNA test at issue violated Morrow's rights to confront the witnesses against him; however, the error falls short of plain error.
 

 ¶17. In
 
 Burdette v. State
 
 , a Panola County jury acquitted the defendant of murder but convicted him of manslaughter.
 
 Burdette v. State
 
 ,
 
 110 So. 3d 296
 
 , 297 (¶ 1) (Miss. 2013). Burdette shot the victim.
 

 Id.
 

 at 297-98
 
 (¶ 2). The
 
 Burdette
 
 Court held that two separate Confrontation Clause violations had occurred at trial. First, a detective testified that he had verified that the weapon used to commit the crime, a
 Sig Sauer handgun, could fire .380 bullets by asking someone at Sig Sauer whether it could.
 

 Id.
 

 at 303
 
 (¶ 22). The
 
 Burdette
 
 Court wrote, "The purported statements of unidentified persons at the company constituted hearsay, and-since it is unclear who contacted the company-perhaps double hearsay and its admission resulted in a violation of the Confrontation Clause."
 

 Id.
 

 at 303
 
 (¶ 23). Second, and apropos of the testimony describing the DNA results in the case
 
 sub judice
 
 , in
 
 Burdette
 
 the same detective testified regarding results of ballistics testing conducted by the crime lab.
 

 Id.
 

 at 303
 
 (¶ 22). No person from the crime lab testified.
 

 Id.
 

 The
 
 Burdette
 
 Court wrote,
 

 Here, the surrogate testimony was presented by a police officer with no apparent relation to the Mississippi Crime Laboratory or to this particular report. The report undoubtedly was testimonial; we have held in a similar case that a "ballistics report provided 'testimony' against [the defendant] by showing that the shotgun shells found at the scene were consistent with having been fired from the shotgun found at the scene."
 
 Conners v. State
 
 ,
 
 92 So. 3d 676
 
 , 684 (Miss. 2012). The analysts were not found to be unavailable, and Burdette had no prior opportunity for cross-examination. The admission of the document without live testimony from an individual involved in the analysis constituted a violation of the Confrontation Clause.
 

 Burdette
 
 ,
 
 110 So. 3d at 304
 
 (¶ 24) (alteration in original). Like the above-described testimony from the detective in
 
 Burdette
 
 , Anderson's testimony regarding the DNA results in the case
 
 sub judice
 
 violated the Confrontation Clause. However, the record does not demonstrate that the error amounted to plain error. In
 
 Burdette
 
 , the Court held that the error did not result in a "manifest miscarriage of justice," because the evidence admitted in violation of the Confrontation Clause related to uncontested matters upon which the parties agreed.
 
 Burdette
 
 ,
 
 110 So. 3d at 304
 
 (¶ 25) (quoting
 
 Conners v. State
 
 ,
 
 92 So. 3d 676
 
 , 684 (¶ 20) (Miss. 2012) ). In the case
 
 sub judice
 
 , Morrow testified that his victim placed Morrow's dentures in his underwear; Morrow's testimony jibed with the State's evidence that his DNA was found on the victim's penis.
 

 ¶18. Moreover, the record in the instant case is devoid of any attempt by Morrow to discredit or even question the results of the DNA test other than to clarify, on cross-examination of Anderson, that the report did not identify Morrow as the contributor of the genetic material but, rather, indicated only that the material came from a male. His trial counsel did not attempt to cross-examine Anderson or any other witness in an attempt to contest the accuracy of the reported results. No questions were attempted that could not be answered by the witnesses available. In other words, nothing in the record indicates to the Court that Morrow's case would have been affected one iota by the presence of someone from the crime lab who performed the DNA testing.
 

 ¶19. We are not free to guess what might have happened in the absence of facts found in the record. Rather, we may only act on the record before us.
 
 Oakwood Homes Corp. v. Randall
 
 ,
 
 824 So. 2d 1292
 
 , 1293 (¶ 4) (Miss. 2002) (citing
 
 Branch v. State
 
 ,
 
 347 So. 2d 957
 
 , 958-59 (Miss. 1977) ). "Facts asserted to exist must and ought to be definitely proved and placed before us by a record, certified by law; otherwise, we cannot know them."
 
 Randall
 
 ,
 
 824 So. 2d at 1294
 
 (¶ 4) (quoting
 
 Mason v. State
 
 ,
 
 440 So. 2d 318
 
 , 319 (Miss. 1983) ). In the absence of indications from the record that Morrow's trial strategy was frustrated or harmed by the absence of the witness who prepared the report, no plain error occurred.
 

 Walters v. State
 
 ,
 
 206 So. 3d 524
 
 , 530 (¶ 16) (Miss. 2016) (In order for plain error to be found, the error in question must be "plain, clear, or obvious" and "prejudice[ ] the outcome of the trial." (quoting
 
 McGee v. State
 
 ,
 
 953 So. 2d 211
 
 , 215 (¶ 8) (Miss. 2007) )). There can be no plain error, reversible violation of the Confrontation Clause when the record contains no effort by the defendant to confront the statement in question.
 

 ¶20. Like
 
 Burdette
 
 , the Confrontation Clause violation did not result in a manifest miscarriage of justice; therefore, no plain error exists.
 

 II. Whether the victim's nonverbal responses were ambiguous and thus insufficient to support the verdict.
 

 ¶21. Morrow argues that the nonverbal responses of the victim were ambiguous and therefore insufficient to support the verdict. In support, Morrow relies on
 
 Jenkins v. State
 
 , in which the Mississippi Court of Appeals wrote that it was "concerned with the ambiguity of [the victim]'s non-verbal response-'(Moving head)'-to the question of whether [the defendant] had inserted his finger into her vagina."
 
 Jenkins v. State
 
 ,
 
 101 So. 3d 161
 
 , 168 (¶ 20) (Miss. 2012).
 

 ¶22. Unlike the transcript in
 
 Jenkins
 
 , the transcript here indicates whether Ben's nonverbal responses were affirmative or negative. Even so, "[a]s always, the jury has the prerogative to accept or reject, in whole or part, the testimony of any witness, expert or lay."
 
 Smith v. State
 
 ,
 
 925 So. 2d 825
 
 , 839 (¶ 33) (Miss. 2006) (holding that the jury may draw its own conclusions from the verbal statements and nonverbal reactions of the witness on the stand). Here, the jury had the prerogative to accept or reject, in whole or part, Ben's testimony. Furthermore, Ben's nonverbal responses certainly did not result in a manifest miscarriage of justice or seriously affect the fairness, integrity, or public reputation of judicial proceedings, because the jury was free to accept Laura's testimony, which mirrored Ben's testimony.
 
 [4]
 

 III. Whether Morrow received ineffective assistance of counsel.
 

 ¶23. Morrow argues that he received constitutionally ineffective assistance of counsel because his trial counsel failed to (1) make objections and (2) perfect and file Morrow's appeal.
 

 ¶24. "Ordinarily, ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings."
 
 Archer v. State
 
 ,
 
 986 So. 2d 951
 
 , 955 (¶ 15) (Miss. 2008). The Court "may, however, address an ineffectiveness claim on direct appeal if the presented issues are based on facts fully apparent from the record."
 
 Dartez v. State
 
 ,
 
 177 So. 3d 420
 
 , 423 (Miss. 2015) (citing M.R.A.P. 22 ). "In order to prevail on a claim of ineffective assistance of counsel, a defendant must prove that his attorney's performance was deficient, and that the deficiency was so substantial as to deprive the defendant of a fair trial."
 
 Holly v. State
 
 ,
 
 716 So. 2d 979
 
 , 989 (¶ 37) (Miss. 1998) (citing
 
 Strickland v. Washington
 
 ,
 
 466 U.S. 668
 
 , 687-96,
 
 104 S.Ct. 2052
 
 ,
 
 80 L.Ed.2d 674
 
 (1984) ). The Court considers "the totality
 of the circumstances to determine whether counsel's efforts were both deficient and prejudical."
 
 Dartez
 
 ,
 
 177 So. 3d at 423
 
 (¶ 19) (citing
 
 Strickland
 
 ,
 
 466 U.S. at 687-96
 
 ,
 
 104 S.Ct. 2052
 
 ). A strong but rebuttable presumption exists that counsel's conduct falls within the wide range of reasonable assistance.
 
 Dartez
 
 ,
 
 177 So. 3d at 423
 
 (¶ 19). The Court will find that counsel's performance was deficient only when a reasonable probability exists that, but for the attorney's errors, the outcome would have been different.
 

 Id.
 

 1. Failure to object
 

 ¶25. The Court has held that "[t]he failure of counsel to make certain objections may fall within the ambit of trial strategy,
 
 [5]
 
 and therefore may not give rise to a claim for ineffective assistance of counsel."
 
 Conners
 
 ,
 
 92 So. 3d at 686
 
 (¶ 25) (quoting
 
 Nix v. State
 
 ,
 
 8 So. 3d 141
 
 , 144 (¶ 13) (Miss. 2009) ).
 

 ¶26. As explained above, the Confrontation Clause violation did not result in plain error. We also find it conceivable that Morrow's trial counsel welcomed the DNA evidence as part of his trial strategy. Morrow's trial counsel argued during closing that Morrow had consented to a DNA test on two occasions-"[n]ot something [Morrow's trial counsel] would believe a guilty man would do."
 

 ¶27. Moreover, Morrow's trial counsel used the DNA test results as part of his argument that the results had merely shown a male contributor. Indeed, Morrow's trial counsel established on Anderson's cross-examination that while the DNA results were positive for a male contributor, the results did not show that Morrow was the contributor. Finally, Morrow fails to demonstrate prejudice resulting from the failure to object to the testimony about the DNA results. Laura's, Ben's, and Anderson's testimony supported the fondling conviction apart from the DNA results.
 

 ¶28. As previously discussed, Ben's nonverbal responses on the witness stand did not result in plain error. For similar reasons, we hold that Morrow's claim that he received ineffective assistance of counsel due to the failure to object to the nonverbal responses fails for lack of prejudice. Even assuming the failure to object or seek to have the trial court instruct the victim to verbally answer constituted deficient performance, Morrow fails to show that the outcome would have been any different had his trial counsel raised the issue at trial.
 
 [6]
 

 2. Failure to perfect and file an appeal
 

 ¶29. Morrow does not point to any resulting prejudice from his trial counsel's failure to perfect and file an appeal. Certainly, no prejudice exists, because Morrow was allowed to file an out of time appeal and to have new appellate counsel appointed.
 

 ¶30. We likewise reject Morrow's suggestion that he received ineffective assistance because his trial counsel did not file any post trial motions. Put simply, Morrow does not explain what post trial motion might have been successful had it been filed. While the Court has held that failure to file a post trial motion may constitute deficient performance, Morrow fails to demonstrate the prejudice resulting from the failure to file a post trial motion.
 
 See
 

 Pace v. State
 
 ,
 
 242 So. 3d 107
 
 , 118 (¶ 31) (Miss. 2018) (holding that the defendant had not shown any prejudice resulting from the failure to file post trial motions because no reasonable probability existed that the motions would have been granted).
 

 IV. Whether cumulative error requires reversal.
 

 ¶31. Morrow argues that the cumulative effect of multiple errors requires reversal under the cumulative error doctrine. While harmless error alone is not reversible, when more than one harmless error occurs at the trial level, the errors might have the cumulative effect of depriving a defendant of a fair trial.
 
 Wilson v. State
 
 ,
 
 21 So. 3d 572
 
 , 591 (¶ 58) (Miss. 2009). Because no cumulative harmless errors require reversal, the cumulative error doctrine is inapplicable.
 

 CONCLUSION
 

 ¶32. While Morrow's right of confrontation was violated, the error did not amount to plain error. Morrow's remaining arguments are without merit. Accordingly, we affirm the circuit court's judgment.
 

 ¶33.
 
 AFFIRMED.
 

 RANDOLPH, C.J., MAXWELL, BEAM, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR. KING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J.
 

 The names of the minor victim and his family members have been changed to protect the identity of the minor victim.
 

 Ben called Morrow "Uncle Ricky."
 

 Ben referred to his penis as his "peepee."
 

 Morrow makes an offhanded remark within the present assignment of error concerning Ben's competency to testify. "[I]n the absence of meaningful argument and citation of authority th[e] Court will generally not consider the assignment of error."
 
 Goff v. State
 
 ,
 
 14 So. 3d 625
 
 , 666 (¶ 181) (Miss. 2009) (citing
 
 Randolph v. State
 
 ,
 
 852 So. 2d 547
 
 , 558 (¶ 30) (Miss. 2002) ). Notwithstanding Morrow's failure to advance a meaningful argument, we discern no plain error surrounding the trial court's finding that Ben was competent to testify.
 

 Morrow makes a suggestion in a footnote, without citing any authority, that his trial counsel had "missed [an] opportunit[y]" to make an opening statement. Morrow's claim is without merit because the "[t]he decision to make an opening statement is a 'strategic one.' "
 
 Burns v. State
 
 ,
 
 813 So. 2d 668
 
 , 677 (¶ 29) (Miss. 2001) (quoting
 
 Manning v. State
 
 ,
 
 735 So. 2d 323
 
 , 347 (¶ 56) (Miss. 1999) ).
 

 Morrow also includes a bare claim within the body of his argument that he received ineffective assistance of counsel because his trial counsel did not object to the State's questions about his prior fondling conviction. First, Morrow's trial counsel opposed the introduction of the conviction. Second, the decision to not object might very well have been for strategic reasons,
 
 i.e.
 
 , choosing not to draw further attention to the prior fondling conviction.