# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-01324-COA

JOSE DURAZNO MONTOYA                                                         APPELLANT

v.

STATE OF MISSISSIPPI                                                          APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 01/17/2023 |
| TRIAL JUDGE: | HON. CHRISTOPHER LOUIS SCHMIDT |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: W. DANIEL HINCHCLIFF STACY L. FERRARO |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ABBIE EASON KOONCE |
| DISTRICT ATTORNEY: | WILLIAM CROSBY PARKER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 08/12/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., McDONALD AND LAWRENCE, JJ.**

**BARNES, C.J., FOR THE COURT:**

¶1.    On December 8, 2022, a Harrison County Circuit Court jury convicted Jose Durazno Montoya (Montoya) of three counts (Counts IV-VI) of touching a child for lustful purposes.[1] The trial court sentenced Montoya to serve concurrent twelve-year sentences for Counts IV and VI in the custody of the Mississippi Department of Corrections (MDOC). For Count V, the court sentenced Montoya to a suspended sentence of fifteen years with non-reporting post-release supervision (PRS), which is to run consecutively to Counts IV and VI. After

---

[1] The jury found Montoya not guilty of Counts I-III (sexual battery).

serving the concurrent sentences imposed in Counts IV and VI, Montoya is to be deported and is ordered not to return to the United States.

¶2. Montoya appeals his convictions, arguing (I) that the trial court's giving of a jury instruction was error and (II) that his trial counsel rendered ineffective assistance. Finding no error, we affirm.

**Facts and Procedural History**

¶3. From approximately 2017 through 2020, Montoya lived in Gulfport, Mississippi, with his brother-in-law Guillermo Montoya, Guillermo's wife, and their son and two daughters—"Jenny" (born in May 2007) and "Ellen" (born in March 2010).[2] In November 2020, Jenny and Ellen revealed to their father that Montoya had been sexually abusing them. David Dooley conducted forensic interviews of Jenny and Ellen at the Child Advocacy Center (CAC) in Gulfport. Jenny disclosed to him that Montoya had touched her breasts, butt, and vagina. She also stated that he made her perform oral sex on him and that he had penetrated her vagina with his penis. Ellen claimed that Montoya had licked her neck, slapped her on the butt, and touched her chest area.

¶4. On March 4, 2022, a Harrison County grand jury indicted Montoya on four counts of sexual battery (Counts I-IV)[3] and three counts of touching of a child for lustful purposes

---

[2] We have used pseudonyms to protect the identity of the female minors who were the victims in this case.

[3] *See* Miss. Code Ann. § 97-3-95(1)(d) (Rev. 2020).

(Counts V-VII).[4] A pretrial motions hearing was held on December 2, 2022. Dooley, the lead forensic interviewer, was accepted by the trial court as "an expert in the area of forensic interviewing." The court reserved ruling on the State's motion to admit Jenny's and Ellen's pretrial statements into evidence on a "tender years" hearsay exception[5] until after the court could review the DVDs of the forensic interviews and hear their testimony. At a subsequent hearing on December 5, the State decided not to proceed with Count IV for sexual battery; so the remaining counts were renumbered.

¶5.    The jury trial began on December 6, 2022. Jenny, then fifteen years old, testified that when she was nine years old, Montoya began touching her on the outside of her clothes, rubbing her thighs, and trying to rub her vagina. From ages ten to eleven, Montoya "would rub his hands against [her] breasts and sometimes squeeze them." Jenny said this happened "[m]ore than ten" times. She noted, "He would sometimes do it on top of my clothes and then he would sometimes reach under my clothes so his hands touched my skin." When Montoya first began touching her, he scared Jenny by saying that if she told anyone, the police would get involved, her "parents would get deported,"[6] and she and her siblings would go to an orphanage.

¶6.    Jenny testified that Montoya would touch her vagina with "[h]is hands, his penis, and

---

[4] *See* Miss. Code Ann. § 97-5-23(1) (Rev. 2020).

[5] *See* MRE 803(25).

[6] Montoya, Guillermo, and Guillermo's wife are undocumented immigrants. Guillermo's children were all born in the United States.

3

his fingers." She also claimed that Montoya had put his mouth on her vagina. After further questioning regarding the touching, the State asked, "And you also indicated that he would touch your vagina with his mouth?" At that point, defense counsel objected to this allegation on the basis that it had not "been disclosed in discovery," noting, "Mouth on vagina is completely new as of today." The State agreed that this was the first time this had been disclosed and clarified, "It is not a count." The defense said, "I feel like I should move for a mistrial at this point." The trial judge reserved ruling on the issue until after the conclusion of Jenny's testimony and instructed the State to "[s]tay away from those allegations."

¶7.     Jenny continued, stating Montoya had twice "forced [her] mouth onto his penis," but she had bit him. She also said Montoya had touched her vagina with his penis when she was approximately eleven years old, and "[h]e would go back and forth with his body to come in and out." Jenny said that these events occurred both in the daytime, when her parents were gone on an errand, or "at night when everybody would be asleep." She claimed Montoya "had a gun in his room," and she prayed "that he wouldn't take it out and use it on my family." Defense counsel objected, saying this was a discovery violation. The court overruled the objection, noting the State did not elicit the testimony about the gun.

¶8.     Jenny testified that in November 2020, her parents and brother had gone to the grocery store and left her and Ellen at home with Montoya. He came into the living room where Jenny was watching videos on her phone and tried to make her watch pornography. She said he "took his penis out and was messing with it and calling [Jenny] over." When Jenny

4

attempted to leave the room, Montoya grabbed her, but she kicked him and went to her parents' bedroom to check on Ellen. Later, when Jenny tried to go to her bedroom, Montoya "grabbed [her] from behind and tried to pull [her] to his room." He pushed Jenny down, took her shorts off, and grabbed her hand to get her to touch his penis. Upon hearing Jenny's parents enter the front door, Montoya told Jenny "to pull [her] clothes on and to get out." When she walked out of Montoya's room, Jenny saw her father looking for her. She told her father she had been taking Montoya a hat. When the family went out to eat a little while later, Jenny's parents asked her if Montoya had touched her, and she began crying.

¶9. During cross-examination, defense counsel asked Jenny if she had "ever seen a medical doctor to get checked out for these abusive things that happened to you." Jenny replied that she had seen a doctor "somewhere in February of 2021." She said her parents also took Ellen to the same doctor.

¶10. At the conclusion of Jenny's testimony, defense counsel renewed the motion for a mistrial based on the defense's objection to the testimony that Montoya "put his mouth on [Jenny's] vagina." Montoya's attorney argued, "This jury has now been tainted by another new allegation the defense has not had any opportunity to confront." The State responded that this was the first time the State had heard the allegation, and the State "actually did not ask her any other questions about that." The prosecutor noted that "the child volunteered it on her own for the first time"; so there was nothing "to disclose previously." Going back through the testimony, the trial judge determined:

5

I don't believe the [S]tate knew of this allegation and attempted to elicit it without it previously being elicited, excuse me, or disclosed in the course of discovery. And that once we had the bench conference, the [S]tate agreed to frame its questions so that that disclosure or that allegation no longer comes before the jury. And I think that cured it.

So the motion -- or whatever is before the jury, I think, is one part of many allegations of sexual abuse over many different months and years, such that that allegation, standing alone, insofar as a disclosure issue is concerned, is not worthy of a mistrial.

The trial judge overruled the motion for a mistrial.

¶11. Ellen, then twelve years old, testified that between the ages of seven and nine years old, Montoya had touched and squeezed her breasts with his hands when her clothes were off, which made her "uncomfortable." Montoya would also "squeeze" or "slap" her buttocks with his hands. Ellen said this occurred "[e]very other day." Montoya also showed her pornography, both on his phone and on TV. Ellen said she was scared to tell her parents, worried they would get mad at her, and she never told Jenny what had happened. Ellen stated that the first time she spoke in detail about what her uncle had done was when she talked to the forensic interviewer.

¶12. Guillermo testified through a qualified court interpreter. Guillermo had lived in the United States for approximately twenty-three years. In November 2020, he was residing in Gulfport with his wife and three children. Montoya was married to Guillermo's sister and had lived with Guillermo's family since 2017 or 2018.

¶13. When Guillermo and his wife came home from an errand in November 2020, he noticed the TV in the living room was turned on, "but there was nobody there." He found

6

Ellen in his bedroom watching TV. Guillermo went to the girls' bedroom looking for Jenny, but it was empty. Guillermo then saw Jenny walk out of Montoya's bedroom. He asked Jenny, "[W]hat were you doing inside, in [Montoya's] room, bedroom?" because he had "always told our daughters not to go into [Montoya's] room without our permission." Guillermo also asked Montoya why she was in there, but Montoya just said that "it was because somebody was dropping off a hat from work." Guillermo told Montoya he "had lost his trust in him," and Montoya packed his belongings and left the home.

¶14. Later, at the restaurant, Guillermo asked Jenny to tell him "what had been happening in [Montoya's] room." She began crying and said Montoya "had touched" her. Guillermo contacted the police. He said the police advised him to take the children to the hospital; so he took them to a doctor after the girls had their forensic interviews on November 20, 2020.

¶15. After Guillermo concluded his testimony, defense counsel moved for a mistrial on the basis of a *Brady* violation,[7] claiming that "there should be hospital records out there that the [S]tate knew about because the witness said he told them" and that those records could be exculpatory. The State responded that it had not "heard anything about a hospital" until Guillermo's testimony and had no medical records. After reviewing its notes, the State could not "find a single mention of any sexual assault examination at a hospital." Upon deliberation, the trial judge denied the defense's motion for a mistrial. The defense later requested the issuance of subpoenas for Jenny's medical records, but the trial judge observed:

---

[7] *Brady v. Maryland*, 373 U.S. 83 (1963).

7

"One, we have a jury in the jury room. No records are going to be produced prior to the end of this trial. It's an impossibility. So let's bring the jury in, continue with the testimony, and keep addressing this matter as we have time."[8]

¶16. The trial court next made its ruling on the "tender-years" hearsay exception, finding both Jenny and Ellen were "of tender years" after having expounded on all the factors.[9] The trial court concluded that a "substantial indicia of reliability" existed for the children's interviews to be admitted, "along with any supportive testimony by" Dooley, the forensic interviewer. The interviews were admitted into evidence and played for the jury. Dooley noted in his testimony that Jenny disclosed in her interview that Montoya had "put his penis both on and in her vagina" and her "butt." He said that Jenny "also disclosed a situation of oral sex" and of his showing her pornography. Dooley testified that Jenny was "open and talkative during her interview." In Ellen's interview, she disclosed that Montoya had touched her chest area, licked her neck, and slapped her on the butt while she was lying on the couch. In Dooley's expert opinion, both girls' characteristics during the interview "were consistent

---

[8] The issue was not raised again by the defense at trial, but the court record shows that the circuit clerk issued subpoenas duces tecum to Singing River Hospital and Gulfport Memorial Hospital on December 27, 2022, requesting any medical records for Jenny between the dates of November 1, 2020, and March 1, 2021. Both hospitals replied that no medical records were found.

[9] Mississippi Rule of Evidence 803(25) provides: "A statement by a child of tender years describing any act of sexual contact with or by another is admissible if: (A) the court—after a hearing outside the jury's presence—determines that the statement's time, content, and circumstances provide substantial indicia of reliability; and (B) the child either: (i) testifies; or (ii) is unavailable as a witness, and other evidence corroborates the act."

with sexual abuse interviews that I have done in the past."

¶17. The State rested, and the defense moved for a directed verdict, which the trial court denied. Montoya elected not to testify. The jury found Montoya "not guilty" for Counts I-III, but found him guilty of all three counts of touching a child for lustful purposes. The trial court sentenced Montoya to serve two twelve-year sentences in MDOC custody for Counts IV and VI, with those sentences to run concurrently. For Count V, the court sentenced Montoya to a suspended fifteen-year sentence with non-reporting PRS, which is to run consecutively to the sentences imposed for Counts IV and VI. As a special condition of his PRS, Montoya is to be deported upon release from MDOC's custody and "shall not re-enter the United States." The court's judgment was entered after the sentencing hearing.

¶18. On January 23, 2023, Montoya's attorney filed a motion for a judgment of acquittal notwithstanding the verdict or, in the alternative, for a new trial. The defense argued that the trial court erred in denying Montoya's motion for a directed verdict. Montoya also asserted that "[t]he [c]ourt erred in not sustaining any or all of [his] objections at trial and such objections and reasons for objections are raised as causes for a new trial even if they are not expressed herein." The trial court denied Montoya's posttrial motion on June 27, 2023.

¶19. On October 25, 2023, Montoya filed a motion seeking permission to file a petition in forma pauperis for post-conviction relief (PCR). The trial court granted the petition, noting that Montoya's attorney "never set a hearing" on the motion for a new trial; nor was a notice of appeal "timely filed by trial counsel within the prescribed thirty (30) days following the

9

Court's denial of the Motion for a New Trial." The trial court therefore allowed Montoya to file an out-of-time appeal.

**Discussion**

I.      **Whether the trial court erred in giving Jury Instruction 14 (formerly S-13A).**

¶20.    The State requested that Jury Instruction S-13A be given, which read: "The Court instructs the Jury that the uncorroborated testimony of a sex crime victim is sufficient to support a conviction if accepted as true by the finder of fact." Despite defense counsel's objection that the instruction "tries to lower the standard beyond a reasonable doubt," the trial court allowed the instruction (renumbered as Jury Instruction 14), finding that it was "an approved instruction as the law currently is."

¶21.    Appealing the court's ruling to give the instruction, Montoya argues that instructions like this one improperly comment on the evidence by acting as "an endorsement from the bench of the purported victim's testimony." He also contends that "the instruction offers a lesser standard of proof which may cause confusion among a deliberating jury."

¶22.    However, Montoya concedes that the Mississippi Supreme Court has affirmed a trial court's giving of an identical jury instruction in *Pitts v. State*, 291 So. 3d 751 (Miss. 2020). In *Pitts*, the defendant argued that the jury instruction "was peremptory in nature, constituted an improper comment on the evidence, was argumentative, and it encouraged circumvention of the state's obligation to prove guilt beyond a reasonable doubt." *Id*. at 757 (¶32). The supreme court determined from precedent that the jury instruction "reflects an accurate

10

statement of the law." *Id*. at 757-58 (¶34); *see Miley v. State*, 935 So. 2d 998, 1001 (¶10) (Miss. 2006) (holding that "the unsupported word of the victim of a sex crime is sufficient to support a guilty verdict where that testimony is not discredited or contradicted by other credible evidence"). The *Pitts* Court further noted that the instruction "did not instruct the jury on how to weigh [the victim's] testimony"; rather, it "properly allowed the jury to determine what weight and credibility to give [the victim's testimony]." *Id*. at 758 (¶36).

¶23. Subsequently, in *Bliss v. State*, 326 So. 3d 1000, 1005 (¶¶17, 21) (Miss. Ct. App. 2021), our Court also upheld a trial court's giving of an identically worded instruction. Noting that we will not reverse if "the given jury instructions fairly announce the law of the case and create no injustice," this Court concluded in *Bliss*:

> After reviewing relevant caselaw and the jury instructions as a whole, we find no abuse of discretion in the circuit court's decision to give instruction S-6. The supreme court [in *Pitts*] has held that an instruction identical to S-6 accurately stated the applicable caselaw and provided no improper comment on the weight of the evidence. Further, when read as a whole, we find that the jury instructions given here "fairly announced the law of the case and created no injustice." As a result, we conclude that Bliss's argument lacks merit.

*Id*. at (¶¶18, 21).

¶24. Based on the Mississippi Supreme Court's precedent in *Pitts* and our precedent in *Bliss*, we find Jury Instruction 14 was a correct statement of the law. Furthermore, the trial court had also instructed the jury, "You are not to single out one instruction alone as stating the law but you must consider these instructions as a whole." Accordingly, we find no error in the trial court's giving of the instruction.

## II. Whether Montoya's trial counsel rendered ineffective assistance.

¶25. "[I]ssues regarding ineffective assistance of counsel on a direct appeal are not usually considered on the merits because 'we are limited to the trial court record in our review of the claim and there is usually insufficient evidence within the record to evaluate the claim.'" *Waldon v. State*, 262 So. 3d 588, 596 (¶29) (Miss. Ct. App. 2018) (quoting *Wilcher v. State*, 863 So. 2d 776, 825 (¶171) (Miss. 2003)). An appellant's claim of ineffective assistance of counsel is typically "more appropriately raised in a motion for post-conviction relief." *Brock v. State*, 348 So. 3d 1007, 1010 (¶5) (Miss. Ct. App. 2022) (citing *Ford v. State*, 333 So. 3d 896, 912 (¶41) (Miss. Ct. App. 2022)).

¶26. Our Court will address a claim of ineffective assistance on direct appeal "when [1] the record affirmatively shows ineffectiveness of constitutional dimensions, or [2] the parties stipulate that the record is adequate and the Court determines that the finding of facts by a trial judge able to consider the demeanor of the witnesses, etc., are not needed." *Id*. (quoting *Ford*, 333 So. 3d at 912 (¶41)). "We also review ineffective-assistance claims on direct appeal if 'the record affirmatively shows the claims lack merit.'" *Id*. (quoting *Ford*, 333 So. 3d at 912-13 (¶41)).

¶27. Montoya contends that the record "affirmatively" shows several instances of ineffectiveness of counsel. The State "does not stipulate that the record is adequate to consider this claim" but alternatively asserts that "Montoya cannot meet his burden." We find the record is sufficient to address Montoya's claims of ineffective assistance because the

12

record shows that his claims lack merit.

¶28. Claims of ineffective assistance are reviewed de novo. *Id*. at (¶7). Our Court has held:

> To prevail on the issue of whether his defense counsel's performance was ineffective requires a showing that counsel's performance was deficient and that the defendant was prejudiced by counsel's mistakes. *Strickland v. Washington*, 466 U.S. 668, 687-96 (1984). The burden is on the defendant to bring forth proof which demonstrates that both prongs of the *Strickland* test are met. *Moody v. State*, 644 So. 2d 451, 456 (Miss. 1994). There is a strong but rebuttable presumption that counsel's conduct falls within a wide range of reasonable professional assistance. *Id*. at 456. Accordingly, appellate review of counsel's performance is "highly deferential." *Strickland*, 466 U.S. at 689. "The deficiency and any prejudicial effect are assessed by looking at the totality of the circumstances." *Carney v. State*, 525 So. 2d 776, 780 (Miss. 1988).

*Howard v. State*, 785 So. 2d 297, 299 (¶6) (Miss. Ct. App. 2001).

### a. Failure to File a Timely Notice of Appeal

¶29. In the trial court's order granting Montoya an out-of-time appeal, the court stated that Montoya's "trial counsel was ineffective for failing to file a Notice of Appeal." Montoya thus contends that the trial court has already determined he received ineffective assistance of counsel.

¶30. In *Morrow v. State*, 275 So. 3d 77, 83 (¶23) (Miss. 2019), the Mississippi Supreme Court considered a defendant's argument that he "received constitutionally ineffective assistance of counsel because his trial counsel failed to . . . perfect and file [his] appeal." The supreme court determined, "Morrow does not point to any resulting prejudice from his trial counsel's failure to perfect and file an appeal." *Id*. at 84 (¶29). "Certainly, no prejudice

exists, because Morrow was allowed to file an out-of-time appeal and to have new appellate counsel appointed." *Id*.; *see also Howard*, 785 So. 2d at 300 (¶¶7-8) (finding no merit in defendant's assertion his trial counsel was deficient in failing to file a notice of appeal, as the defendant had been allowed an out-of-time appeal and had failed to demonstrate prejudice or "prove how the outcome of his trial would have been different if his trial counsel had initially filed a timely appeal"). Similarly, in this instance, we find that Montoya's trial attorney's failure to file a timely notice of appeal did not prejudice Montoya's defense, as he was allowed to file an out-of-time appeal.

### b. Failure to Make a Timely Objection to Testimony

¶31. Montoya contends that defense counsel objected "way too late to keep the jury from hearing" Jenny's "highly inflammatory" testimony that Montoya had touched her vagina with his mouth. Montoya also notes "[n]o request was made for a curative instruction." The record shows that when the State asked Jenny about Montoya's putting his mouth on her vagina, defense counsel immediately objected to this question, arguing that it constituted a discovery violation. The State agreed that this was a new allegation and complied with the trial judge's instruction not to ask any further questions in this regard. Defense counsel renewed the motion for a mistrial at the close of Jenny's testimony. The trial court denied the motion and found the court's instruction to the State had "cured" the issue.

¶32. Thus, we find it evident from the record that defense counsel appropriately objected to the testimony and questioning regarding the allegation of oral sex. Further, even if there

14

were error by counsel, Montoya has not shown how his defense was prejudiced. To establish that counsel's error prejudiced the defense, the defendant must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable . . . and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ronk v. State*, 267 So. 3d 1239, 1248 (¶19) (Miss. 2019).

¶33. Lastly, an attorney's decision to request a curative instruction "falls squarely within the realm of trial strategy" and could have "inadvertently brought undue consideration" to the allegedly harmful statement at issue. *Hancock v. State*, 964 So. 2d 1167, 1179 (¶27) (Miss. Ct. App. 2007).[10] Accordingly, we find no merit to Montoya's claim.

        *c.      Failure to Investigate Jenny's Medical History and Records*

¶34. Montoya takes issue with his attorney's failure to obtain medical records related to any potential hospital visit by the victims after the abuse allegations were made, arguing that his trial counsel's "failure to investigate deprived Montoya of evidence which would have been crucial, and perhaps determinative, of his case."

---

[10] Other than to assert that counsel's objection "came way too late," Montoya has cited no authority that the failure to make a more timely objection constitutes ineffective performance resulting in prejudice to the defendant. *See Cork v. State*, 329 So. 3d 1183, 1192 (¶35) (Miss. 2021) (rejecting appellant's argument that counsel's failure to object was ineffective assistance because he did "not provide any argument or citation of authority to bear his burden of proving constitutional ineffectiveness" nor any "argument that he was prejudiced").

¶35. The Mississippi Supreme Court has held that a defendant's alleging that his "trial counsel's failure to investigate constituted ineffectiveness must also state with particularity what the investigation would have revealed and specify how it would have altered the outcome of trial," or he must explain "how such additional investigation would have significantly aided his cause at trial." *Woodward v. State*, 843 So. 2d 1, 18 (¶46) (Miss. 2003) (citations omitted). Montoya has failed to do so, and he even concedes in his brief, "Would the case have reached a different outcome, we cannot know." Furthermore, the State noted during the trial that it had no medical records. Our record also contains subpoenas duces tecum issued to two local hospitals after trial, as well as letters from the hospitals stating no medical records for Jenny were found. All this information was received prior to sentencing. Therefore, we find Montoya cannot meet his burden and show how counsel's failure to investigate deprived him of crucial and determinative evidence, as argued.

### d. Failure to Object to Court Interpreter's Qualifications

¶36. Montoya claims that his attorney's failure to object to a court interpreter's qualifications was another example of ineffective assistance. A court interpreter—Eddie Rabel—assisted with translation for Guillermo's testimony.[11] Midway through the testimony, during a jury recess, the trial court put on the record that Rabel had "been accepted by both sides as an interpreter." Rabel clarified for the trial court that he was not a "certified court

---

[11] Two other court interpreters—Arlin Lang and Catherine Santiago—assisted the defense with translation for Montoya. Montoya has not cited any particular issues with his court interpreters with regard to this assignment of error.

16

interpreter," but he was a "qualified interpreter," having "received the course from the state ethics and practices from the state." He said he had "been doing this job with child protection for the last seven years." With "no objection from either side as to the interpreter's ability," the trial court concluded:

> The guidance from the [Administrative Office of Courts] is that the interpreter either be first certified, if not certified and then registered, and then non credentialed. It seems like Mr. Rabel is non credentialed, but has the sufficient experience, knowledge, and training to accurately perform those duties under his oath. So he is okay with the court then.[12]

To support his claim of ineffective assistance, Montoya cites Mississippi Code Annotated section 9-21-73(3) (Rev. 2019), which provided that "[i]n all state court bilingual proceedings, the presiding judicial officer, with the assistance of the director [of the Administrative Office of Courts], shall utilize the services of a *certified interpreter* to communicate verbatim all spoken or written words when the necessity therefor has been determined pursuant to Section 9-21-79." Miss. Code Ann. § 9-21-73(3) (Rev. 2019)

---

[12] The trial court's ruling is in accordance with Rule 4 of the Mississippi Rules on Standards for Court Interpreters. Rule 4(B)(1) states that before a trial court may appoint a "non-credentialed interpreter," the court shall make an on-the-record finding

(a) that the proposed interpreter appears to have adequate language skills, knowledge of interpreting techniques, and familiarity with interpreting in a court setting; and

(b) that the proposed interpreter has read, understands, and agrees to abide by the Mississippi Code of Ethics for Court Interpreters and the Mississippi Rules on Standards for Court Interpreters.

17

(emphasis added).[13] He argues that his attorney's failure to object "abrogated" any "protection offered by the statute."

¶37. Rule 4(B)(1) of the Rules on Standards for Court Interpreters clearly provides for the use of a "non-credentialed interpreter," and the trial court made an on-the-record finding that Rabel was qualified to serve as a court interpreter at trial. Montoya has not cited any errors that the qualified interpreter made at trial.[14] Regardless, since Guillermo did not testify regarding the acts committed by Montoya nor any of the elements of the charged crimes, we cannot fathom that alleged translation error(s) during his testimony would have resulted in prejudice to Montoya's defense.

### Conclusion

¶38. Having found no error, we affirm Montoya's convictions and sentences.

¶39. **AFFIRMED.**

**CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR.**

---

[13] In 2023, the statute was revised, and the qualifier that the interpreter be "certified" was removed. Miss. Code Ann. § 9-21-73 (Supp. 2023).

[14] To do so, Montoya would need to have an interpreter compare the audio of Guillermo's testimony with the record to determine if the trial interpreter made any error. Such comparison could only be made with additional testimony not in the record before us (i.e., in a PCR motion). Thus, were we to address this issue with regard to testimony by a victim, defendant, eyewitness, or expert witness, we acknowledge that such error could be potentially prejudicial, and we would dismiss the claim without prejudice, allowing the defendant to raise this issue in a PCR motion.