# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-00966-COA

AUSTIN BROOKSHIRE A/K/A AUSTIN ROBERT BROOKSHIRE — APPELLANT

v.

STATE OF MISSISSIPPI — APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 08/07/2023 |
| TRIAL JUDGE: | HON. PRENTISS GREENE HARRELL |
| COURT FROM WHICH APPEALED: | PEARL RIVER COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: MOLLIE MARIE McMILLIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: KATY TAYLOR SARVER |
| DISTRICT ATTORNEY: | HALDON J. KITTRELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 09/09/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., WESTBROOKS AND LASSITTER ST. PÉ, JJ.**

**WESTBROOKS, J., FOR THE COURT:**

¶1.     Austin Brookshire was convicted of first-degree murder in the shooting death of Willie Jones. On appeal, Brookshire argues that the trial court erred in failing to suppress inculpatory statements made during a custodial interrogation in violation of his right to an attorney. Brookshire also argues that his Confrontation Clause rights were violated when a testifying officer repeated statements his co-defendant made during the course of the investigation. Finding no reversible error, we affirm.

## FACTS AND PROCEEDINGS BELOW

¶2.     According to the testimony developed at trial, brothers Dustin Gray and Austin Brookshire were driving in a car with their friend Willie Jones in the early morning hours of July 6, 2020, when Brookshire turned around from the front passenger seat and fatally shot Willie, who was sitting in the backseat listening to music with headphones. Earlier that evening, on July 5, all three had been at the house of Dietrich McGill in Picayune, along with Willie's cousin Dakeyvion Jones. Willie kept a large amount of cash in an orange Nike shoebox that he would sometimes display and count. Dietrich and Dakeyvion testified that Willie had been displaying and counting the money that evening at Dietrich's house.

¶3.     When Dietrich went to bed after midnight, Willie, Gray, and Dakeyvion were still in the living room. Gray told Dietrich that Brookshire had gone outside. Dakeyvion testified that Brookshire had been inside the house at some point, and that the last person he saw Willie with was Dustin Gray. Dakeyvion also testified that he saw Gray's car return later, around 3:30 a.m.  Dakeyvion testified that Willie was dressed well and would typically wear a ring, chain, gold Rolex, and diamond earrings.

¶4.     The Picayune Police Department began an investigation after Willie's family reported him missing. Detective Rhonda Johnson learned that Brookshire's brother, Gray, had been one of the last people seen with Willie Jones, and she received information that Gray had brought his car to a local detail shop mid-morning on July 6. Detective Johnson interviewed Willie McCormick, the proprietor of the detail shop, and an employee. She separately showed them a six-person photo line-up, and they each identified Gray as the person who had brought in the car. McCormick had refused to detail Gray's car after he discovered blood and

2

a bullet casing in the backseat. The car was eventually found at a house on the Gulf Coast where Gray and Brookshire's other brother Andrew was staying.

¶5. The police executed a search warrant on Gray's house and discovered stolen firearms. Gray was added to the NCIC database and ultimately apprehended in Colorado on July 16. Detective Johnson flew to Colorado and interviewed Gray, who told her the location of Willie's body. The body was located in a shallow grave off of Texas Flat Road in a heavily wooded hunting-club area. After Willie was shot, Gray and Brookshire retrieved the shoebox of money from where Willie had stowed it. They then threw the gun and Willie's clothes into Lake Pontchartrain before going to Lowe's in Slidell when it opened at 6:00 a.m. At Lowe's, they purchased two shovels, a container bin with rolling wheels, and bleach. The jury was shown surveillance video footage of the two brothers making the purchases at Lowe's. Because the location of the body was outside the city limits, the Pearl River County Sheriff's Department took over the investigation. As a result of Gray's conversation with Detective Johnson, Brookshire was developed as a suspect.

¶6. Gray and Brookshire's younger brother Andrew testified at trial.[1] Andrew testified that he met with Brookshire at a friend's house in Rankin County several days after the shooting. Brookshire told Andrew "that [Gray] told him to shoot [Willie,] and he did." Brookshire also told Andrew that he and Gray went to Lowe's. A few days after that conversation, Andrew and Brookshire met again at a Waffle House in Florence. Brookshire gave Andrew a large amount of cash and told him that "[Gray] was on the run and if he got

---

[1] Andrew was charged with aiding and abetting and hindering criminal prosecution. He negotiated a five-year plea deal as part of his agreement to testify at trial.

caught . . . I needed to get him a lawyer." Andrew hid the cash on a family member's property.

¶7.     Brookshire was arrested in Rankin County on Friday, July 17, 2020, by Investigator Richard Gulledge of the Pearl River County Sheriff's Department. At the time of the arrest, Brookshire invoked his Fifth Amendment right to counsel and declined to be interviewed. On Sunday, July 19, 2020, Gulledge had Brookshire brought from his cell to an interview room. Brookshire had not been arraigned or appointed counsel. In the first minute of the interaction, Gulledge asked Brookshire how he was doing, saying things like, "[H]ow you making it? . . . I can understand you being overwhelmed . . . . You probably got a lot of stuff swirling around in your mind. Probably playing the 'what if' game." Gulledge then told Brookshire that the purpose of his visit was to ask for a voluntary DNA sample. Around the 3:00 minute mark of the interview, Gulledge told Brookshire that he had talked to Brookshire's parents on the night of the arrest and again on the morning of the interview. He said, "They're worried about you man." He said that Brookshire's parents seem like good people and "they're struggling with it, that's for sure." Brookshire responded, "I'm struggling with it myself. It's not me." Gulledge responded, "I believe that. I believe that whatever happened, is not what you would normally do." Brookshire then began crying and said, "That's not me at all."

¶8.     Then, after a long silence, Gulledge said, "I believe you when you tell me that that's not normally you and that's not in your nature . . . . I will say this. I'm not trying to get you to talk to me." Brookshire responded, "I've been wanting to talk to you it's just, I didn't want

4

to do it without a lawyer. I wanted to talk to a lawyer first my legal rights [sic]." Gulledge responded, "I think you wanted to talk to me the other night." Brookshire replied, "[I]t wouldn't be smart without a lawyer. Anything I say could be used."

¶9. At this point in the interview (around the 8:00 minute mark), Gulledge said, "[P]rotection. I get that. I don't fault you for that. I will say this, from Friday night on, until this is all over, its not about me helping you, it's about you helping yourself. Do you understand me? Do you understand the difference? You have to be willing to step up and help yourself before anyone else can do anything for you. I think you've been wanting to do that. I think you realize that that is probably the only play you have right now."

¶10. Around the 9:00 minute mark, Gulledge presented Brookshire with the DNA sample consent form and read it out loud to him. Brookshire signed the form at the 13:00 minute mark. Gulledge left the room to get the testing kit and then took the sample at the 17:00 minute mark. Around the 20:00 minute mark, Gulledge explained the bond process and the factors the judge would take into consideration. He told Brookshire, "I don't know what the judge is going to set your bond at."

¶11. Brookshire asked Gulledge what his brother had said. Gulledge said, "[T]hat's stuff that we can't talk about right now," but then he went on to say that Gray had "talked at length." Gulledge said, "[I]t's out. We know. . . . [U]s talking to you is just merely giving you the opportunity to get your side of the story out." Brookshire then said, "I want to talk," and, "I know my brother hasn't told y'all the truth." Gulledge confirmed that Brookshire wanted

5

to talk without an attorney. Brookshire signed a *Miranda*[2] waiver form and then gave an inculpatory statement.

¶12.    On July 20, Gulledge interviewed Gray and Brookshire's younger brother Andrew Brookshire. On July 21, Gulledge returned to interview Brookshire again. Brookshire had still not had an initial appearance or been appointed an attorney. Brookshire signed a *Miranda* waiver form and made further inculpatory statements. Brookshire spoke again with Gulledge without an attorney present several months later. In that interview, which Brookshire had requested, Brookshire changed his version of the events to say that Gray had been the one to pull the trigger.

¶13.    Brookshire filed a pretrial motion to suppress the inculpatory statements made following his three interviews with Gulledge. The trial judge denied the motion after conducting a suppression hearing, listening to Gulledge's testimony, and viewing the video recordings of the interviews. At trial, the witnesses included Andrew, Dietrich, Dakeyvion, Detective Johnson, McCormick, Investigator Gulledge, other investigators, including the dive team leader who retrieved two shovels and the bleach can from the creek near the shallow grave, three forensic experts, and others.

¶14.    The jury convicted Brookshire of first-degree murder. The court sentenced him to life imprisonment in the custody of the Mississippi Department of Corrections. He now appeals, arguing that his inculpatory statements should have been excluded from the evidence and that a violation of his right to confront a witness amounted to plain error.

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 479 (1966).

**STANDARD OF REVIEW**

¶15.  We will "reverse a trial court's denial of a motion to suppress if the court's ruling was manifest error or contrary to the overwhelming weight of the evidence." *Downey v. State*, 144 So. 3d 146, 150 (¶6) (Miss. 2014). However, we will not reverse if the error was harmless. *Walton v. State*, 998 So. 2d 971, 976 (¶14) (Miss. 2008) (citing *Chapman v. California*, 386 U.S. 18, 22 (1967)). Under a plain-error standard of review, appellate courts determine whether there was an error that "adversely affected a defendant's substantive rights, causing a manifest miscarriage of justice." *Johnson v. State*, 290 So. 3d 1232, 1241 (¶34) (Miss. 2020) (quoting *Rodgers v. State*, 166 So. 3d 537, 544 (¶15) (Miss. Ct. App. 2014)).

**DISCUSSION**

**I.      Whether the trial court erred in denying Brookshire's motion to suppress.**

*A.      Did Investigator Gulledge conduct a custodial interrogation?*

¶16.  Brookshire argues that Investigator Gulledge's conversation with him while obtaining the DNA sample was the functional equivalent of a custodial interrogation and violated his invoked right to counsel. "Anyone subject to custodial interrogation must be advised of his right to remain silent and have an attorney present." *Miranda*, 384 U.S. at 479. A custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. "If the subject invokes the right to remain silent, then the questioning must stop; and if the subject requests counsel, the questioning must cease until an attorney is

7

present." *Id.* at 474. "[A]ny statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." *Id.*

¶17.    "[A]n accused . . . having expressed his desire to deal with the police only through counsel[] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484 (1981). A valid waiver of the right to have counsel present during custodial interrogation "cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Id.* "When an accused makes an in-custody inculpatory statement without the advice or presence of counsel, even though warnings and advice regarding his privilege against self-incrimination have been fully and fairly given, the State shoulders a heavy burden to show a knowing and intelligent waiver." *Neal v. State*, 451 So. 2d 743, 753 (Miss. 1984).

¶18.    This Court has held that a "simple request for physical evidence" is not "reasonably likely to elicit an incriminating response" and does not necessarily rise to the level of an interrogation. *Brown v. State*, 336 So. 3d 134, 141 (¶20) (Miss. Ct. App. 2020).[3] However, we have also described as "improper" officer-initiated contact that was made for the purpose of obtaining a DNA sample. *Forrest v. State*, 863 So. 2d 1056, 1061 (¶14) (Miss. Ct. App. 2004). Similar to our case, in *Forrest*, officers reinitiated contact with a suspect in custody after he invoked his right to an attorney but before his initial appearance and appointment of

---

[3] In *Brown*, a defendant confessed after being called back to an interview room to see if he would consent to a gunshot residue test. *Id.* at 140 (¶10).

8

counsel. *Id.* at 1060 (¶7). The suspect was asked to consent to a bodily search to procure DNA samples for testing. *Id.* While finding that Forrest had consented to giving the DNA sample, we stated that "Forrest's assertion that [the officer's] re-initiating questioning was improper is clearly meritorious." *Id.* at 1061 (¶14). However, Forrest's request to suppress the DNA sample failed because "the seizure of evidence that is of a scientific nature, and that is not of a communicative nature, is not protected by the right against self-incrimination." *Id.*

¶19.    Here, Gulledge's interviews with Brookshire contained the hallmarks of a custodial interrogation. *See Winstead v. State*, 391 So. 3d 1273, 1283 (¶30) (Miss. Ct. App. 2024) (trial court erred by denying motion to suppress when officer told defendant it would be in his "best interest" to speak without a lawyer). Gulledge initiated and re-initiated communication with Brookshire, both times deliberately guiding the scope of the conversation to the crime and investigation. Gulledge referenced Brookshire's parents, his belief that what happened was not in Brookshire's nature, that Brookshire's need to "help himself" was his "only play," and that Gray had told them everything. The conversation went beyond small talk incidental to the requested and obtained DNA sample.

¶20.    A functional equivalent of a custodial interrogation means "words or actions . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Pannell v. State*, 7 So. 3d 277, 282 (¶12) (Miss. Ct. App. 2008) (citing *Rhode Island v. Innis*, 446 U.S. 291 (1980)). Here, during Gulledge's first two interviews with Brookshire, who had invoked his right to counsel and who had not yet been arraigned, that

9

threshold clearly was crossed.[4]

### B. Does the Fifth Amendment violation amount to harmless error?

¶21.    The State argues that even if Gulledge violated Brookshire's Fifth Amendment right to counsel, any error in failing to suppress inculpatory statements resulting from the interviews was harmless in light of the additional overwhelming evidence presented against Brookshire at trial. "Constitutional error does not automatically require reversal of a conviction." *Walton*, 998 So. 2d at 976 (¶14) (citing *Chapman*, 386 U.S. at 22). "An error may be found by this Court to be harmless beyond a reasonable doubt only 'where the weight of the evidence against the accused is overwhelming.'" *Id.* (quoting *Hopkins v. State*, 799 So. 2d 874, 879 (¶10) (Miss. 2001)). *Miranda* violations can be found to be harmless error if the admitted evidence "was without any substantial prejudicial effect under all of the facts and circumstances of the case." *Hopkins*, 799 So. 2d at 879 (¶10).

¶22.    Under all of the facts and circumstances of this case, we agree that the evidence against Brookshire was so overwhelming as to overcome the potential prejudice of the inculpatory statements. Brookshire confessed on two separate occasions to his brother Andrew and gave Andrew the cash he and Gray had stolen from Willie. The jury heard Andrew's testimony that Brookshire confessed that he had shot Willie and that he went to Lowe's to buy supplies to bury the body. The jury saw a surveillance video of Brookshire and Gray at Lowe's buying supplies used to bury the body. In light of the overwhelming evidence against Brookshire, we find that any error in the trial court's failure to suppress Brookshire's

---

[4] The third interview occurred months later and does not implicate the same concerns, given that Brookshire requested to meet with Gulledge.

10

inculpatory statements is harmless. Therefore, no reversible error occurred.

> **II. Whether Detective Johnson's testimony pertaining to Gray's interrogation constituted a plain error in violation of Brookshire's rights under the Confrontation Clause.**

¶23. Gray did not testify at trial. Brookshire argues that the State relied heavily on Detective Johnson's testimony in recounting what Gray told her about Brookshire's actions. He argues that this testimony violated his Confrontation Clause rights. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. Amend. VI. "Where testimonial evidence is at issue . . . the Sixth Amendment demands . . . unavailability and a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 68 (2004).

¶24. Brookshire's trial attorney did not object to Johnson's testimony. However, Confrontation Clause violations can be reviewed for plain error. *Conners v. State*, 92 So. 3d 676, 682 (¶15) (Miss. 2012). "In order for plain error to be found, the error in question must be 'plain, clear, or obvious' and 'prejudice the outcome of the trial.'" *Morrow v. State*, 275 So. 3d 77, 83 (¶19) (Miss. 2019) (quoting *McGee v. State*, 953 So. 2d 211, 215 (¶8) (Miss. 2007)).

¶25. The State argues that Detective Johnson's testimony was admissible to show the progress of the police investigation and was not offered for the truth of Gray's statements. The State alternatively argues that even if a Confrontation Clause violation did occur, Brookshire did not suffer prejudice as a result. Under the more limited plain-error standard of review, we agree, for the same reasons discussed above, that any error does not require

11

reversal in light of the additional overwhelming evidence supporting the conviction.[5]

## CONCLUSION

¶26.    Investigator Gulledge's initial interviews with Brookshire subjected him to custodial interrogations in violation of Brookshire's constitutional right to an attorney. However, in light of the total facts and circumstances of the case, the admission of the inculpatory statements does not constitute reversible error. We further find no plain error regarding Brookshire's rights under the Confrontation Clause. Therefore, Brookshire's conviction and sentence are affirmed.

¶27.    **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., McDONALD, LAWRENCE, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR.  CARLTON, P.J., AND McCARTY, J., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**

---

[5] Brookshire also argues that his trial counsel was ineffective for failing to object to Johnson's testimony. Claims of ineffective assistance of counsel are typically best preserved for post-conviction collateral review when the parties have not stipulated as to the record's adequacy, unless the ineffective assistance is apparent from the record on direct appeal. *See Bowlin v. State*, 154 So. 3d 883, 884 (Miss. 2015). We therefore dismiss this claim without prejudice to Brookshire's ability to raise the issue in a proper motion for post-conviction collateral relief.